[No. F026343. Fifth Dist. Feb. 9, 1999.]

DAVID W. MARIANI et al., Plaintiffs and Appellants, v.
PRICE WATERHOUSE, Defendant and Respondent.

## COUNSEL

Carr, DeFilippo & Ferrell, Robert J. Yorio and James W. Lucey for Plaintiffs and Appellants.

O'Melveny & Myers, Linda J. Smith, Kenneth R. O'Rourke, Kevin M. Harr, Karen L. Stevenson; McCormick, Barstow, Sheppard, Wayte & Carruth and Marshall C. Whitney for Defendant and Respondent.

## OPINION

**VARTABEDIAN, J.**—Plaintiffs David W. Mariani, Herbert R. Benham, Jr., and the David W. Mariani Investment Partnership (Mariani Investment Partnership) (appellants) appeal from a judgment entered in favor of respondent Price Waterhouse. The cause below arose from appellants' assertion that respondent allegedly misrepresented the financial condition of a corporation whose debts appellants guaranteed. As to two counts, the trial court sustained respondent's demurrer without leave to amend; as to the remaining counts, the court granted summary judgment for respondent. We affirm the judgment.

### Facts and Procedural History

American Western Banker (AWB) is a California leasing corporation organized in 1979. As relevant here, AWB served agricultural customers who wanted to lease equipment, such as tractors, or fixtures, such as irrigation systems and silos. AWB borrowed money from commercial banks to purchase the equipment or fixtures, then leased the item to its customer. AWB either held the lease in its own portfolio or assigned the lease to the lender bank, normally with recourse against AWB. Because of the high cost of the money available to AWB, its customers tended to be marginal borrowers who could not obtain loans or leases in the primary market.

Appellants Mariani and Benham were major stockholders in AWB; they were on the AWB board of directors and Mariani was its chairman. In addition, to facilitate the borrowing that was essential to AWB's business plan, Mariani and Benham—through various investment partnerships of which they were general partners, including appellant Mariani Investment Partnership—guaranteed AWB's lines of credit with various commercial lenders. Appellants had no role in the day-to-day operations of AWB.

When AWB initially was organized, the investors tried to structure the corporation so that management (many members of which were also shareholders and members of the board of directors) was strictly accountable for the quality of the leases obtained and for the financial practices of the company. Accordingly, the board of directors adopted the following measure at its first meeting in 1979:

"RESOLVED: This corporation shall, and hereby does, adopt a procedure to be followed for the approval of leases. The procedure shall be to:

". . . . . . . . . . . . . . . . . . . . . . . . . .

"4. Submit lease analysis to all Board members.

"5. Gain credit approval [of lessee] by a bank credit department.

"6. Obtain approval from one director representing the Mariani Group (David or Mark Mariani).

"7. Obtain approval from one director representing the Berrenda Mesa Group (Herb Benham or Jack LaGrass).

"In the case that there is no director available from either the Mariani Group or the Berrenda Mesa Group then Phil Benner or the second person in the other group is authori[z]ed to approve the transaction."

Around the time of that first board meeting, AWB retained the accounting firm of Deloitte, Haskins & Sells.[1] As Mariani stated in various declarations filed in this action:

"It was expressly made known to the AWB auditors, by me or under my direction, that management practices should be reviewed and that I and the board of directors of AWB should be informed of any irregularities or questionable practices.

". . . Auditors . . . were specifically hired with directions to institute a system of checks and balances to insure that management executed the directives of the board of directors of AWB, under my direction, and in accordance with established policies and procedures." (From a 1990 declaration.)

"When [AWB] was formed in 1979, plaintiff Herbert R. Benham, Jr., and I were insistent upon the use of a Big Eight (now Big Six) accounting firm to regularly audit AWB's financial statements regardless of the additional cost. Mr. Benham and I requested that audited financials be prepared and that AWB's accountants be instructed to monitor the implementation of the system of checks and balances governing the authorization of lease transactions in order to protect our interests as guarantors of AWB's debt. . . ."

---

[1]Deloitte Touche, successor to Deloitte, Haskins & Sells (hereafter Deloitte as to either entity), originally was a defendant in this action. Deloitte's motion for summary judgment was denied and, we are informed, appellants and Deloitte reached a settlement of the claims against it.

"............................

"At or about the time of that Board meeting, I met with Deloitte representatives and discussed with them the scope of their services. . . . At that initial meeting, the basic business of AWB was discussed with Deloitte representatives along with the critical need for continued and expanded bank borrowings on the part of AWB, to be secured, in part, upon [*sic*] guarantees by Mr. Benham and myself." (From a 1995 declaration.)

With some exceptions, Deloitte gave AWB a clean bill of financial health for the fiscal years ending June 30, 1980, through 1983.

Nevertheless, because of a downturn in the agricultural economy in the early 1980's and because of allegedly corrupt practices by management of AWB throughout its existence, AWB was in serious financial trouble by 1984. Its lines of credit were exhausted, lease payments were not generating sufficient cash flow to service the corporate debt, and the collateral securing its lessees' obligations proved insufficient when AWB sought to foreclose on delinquent accounts. By this time, all of the lines of credit that appellants guaranteed had been fully drawn down by AWB.

AWB hired respondent to audit its financial statement for the fiscal year ending June 30, 1984. Mariani stated in his 1990 declaration that respondent also was "specifically hired with directions to institute a system of checks and balances to insure that management executed the directives of the board of directors of AWB, under my direction, . . ."

Respondent issued an unqualified audit of AWB's June 30, 1984, financial statement. Its audit of the June 30, 1985, financial statement was qualified by respondent's conclusion that it was questionable whether AWB could continue as a "going concern" as then structured, but the audit report failed to note any qualifications to the financial condition as stated by AWB management.

During 1985, AWB defaulted on its bank loans and did not write any new leases. Plaintiffs were called upon to pay AWB's debt to three lenders pursuant to their guaranties. They did so in two cases and Mariani entered into a long-term payout agreement with the third lender. The total amount paid or to be paid on the guaranties is alleged to be $7.5 million.

In 1987, AWB sued Deloitte and respondent for negligence and breach of contract. That complaint was never served on the defendants. In 1988, AWB filed an amended complaint which added the present appellants as plaintiffs

and added misrepresentation counts against each defendant. This complaint was served in 1990. That same year, the trial court dismissed the entire action for failure to serve the initial complaint within two years after the action was filed. On appeal, we affirmed the dismissal as to AWB, but reversed as to the present appellants to the extent they sued as "guarantor[s] . . . in their own right, not as subrogees of AWB." (*American Western Banker* v. *Price Waterhouse* (1993) 12 Cal.App.4th 39, 51 [14 Cal.Rptr.2d 916].)

On remand, appellants filed a second amended complaint. That complaint alleged causes of action against Deloitte and respondent for negligence, breach of contract, negligent misrepresentation and intentional misrepresentation. By order filed June 7, 1994, the trial court sustained the demurrers of Deloitte and respondent, without leave to amend, as to the counts for negligence and breach of contract. The court sustained the demurrers with leave to amend as to the misrepresentation counts.

Appellants filed a third amended complaint against Deloitte and respondent. The complaint alleged a cause of action for negligent misrepresentation and one for intentional misrepresentation against each defendant. On February 2, 1996, the trial court filed a written opinion and order granting respondent's motion for summary judgment on both counts. In particular, the court concluded there was no triable issue of material fact concerning appellants' actual reliance on respondent's audit reports or other representations; the court also found that appellants lacked "standing" to pursue misrepresentation causes of action against respondent. "In addition," the court granted summary adjudication on the cause of action for negligent misrepresentation "for failure to satisfy [the] standards" set forth in *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] (hereafter *Bily*). "Finally," the court also granted summary adjudication on both causes of action to the extent they arose from the 1985 audit report, on the basis that any reliance on that report was unjustifiable. (The court denied Deloitte's motion for summary judgment. Appellants settled with Deloitte just before the scheduled date of voluntary mediation.)

On April 25, 1996, the trial court entered judgment against appellants and in favor of respondent. Appellants filed a timely notice of appeal.

### Discussion

#### A. Appellants' Contentions

Appellants' contentions on this appeal are numerous. However, resolution of all issues is controlled by *Bily*. The issues appellants raise are these:

(1) The court erred in sustaining the demurrer without leave to amend as to the negligence and breach of contract counts. (a) As to the negligence count, appellants contend Mariani is the person who contracted for and engaged the audit services. Accordingly, he may pursue a general negligence claim under the standard established in *Bily, supra,* 3 Cal.4th at page 406. (b) As to the breach of contract claim, appellants contend they were traditional third party beneficiaries of the auditing contract with respondent and that *Bily* still permits an action by express third party beneficiaries. They rely primarily on *Soderberg* v. *McKinney* (1996) 44 Cal.App.4th 1760 [52 Cal.Rptr.2d 635].

(2) The court erred in granting summary judgment and summary adjudication. (a) Appellants contend the trial court erred in finding there was no triable issue concerning their actual reliance on respondent's representations. They contend both Mariani and Benham failed to seize control of management of AWB in a timely manner because they relied on respondent's representations. They also contend Mariani entered into new guaranties of the corporate debt at a time when accurate information from respondent would have allowed him to reduce his exposure. (b) As to the negligent misrepresentation count, appellants contend there was a triable issue of fact concerning whether, in the words of *Bily,* respondent made representations " 'with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction . . . .' " (*Bily, supra,* 3 Cal.4th at p. 414.) (c) Finally, appellants argue that the trial court erred in granting summary adjudication of both counts insofar as they concern the 1985 audit report. Appellants contend the court could not restructure the third amended complaint to, in effect, state separate causes of action on each set of representations by respondent, then summarily adjudicate some of the restructured causes of action.

## B. *Bily*

The plaintiffs in *Bily* were investors in a company; some of the plaintiffs had purchased stock from the company, while others loaned money or guaranteed the company's bank loans in exchange for stock options. The lead plaintiff, Robert Bily, had purchased $1.5 million in stock in early 1983 and was a director of the company. (*Bily, supra,* 3 Cal.4th at p. 377.)

Arthur Young & Company was the outside auditor for the company. It issued unqualified audit reports on the company's 1981 and 1982 financial statements. (*Bily, supra,* 3 Cal.4th at p. 377.) The plaintiffs relied on these reports in making their investment decisions. (*Id.* at pp. 377-378.)

In September of 1983, the company filed for bankruptcy and the plaintiffs ultimately lost their investments. (*Bily, supra,* 3 Cal.4th at p. 378.) The plaintiffs sued Arthur Young & Company for professional negligence, negligent misrepresentation and intentional fraud. (*Ibid.*) A jury found in favor of defendant on the misrepresentation and fraud counts, but found in the plaintiffs' favor on the professional negligence count. (*Id.* at p. 379.) The defendant appealed; the Court of Appeal affirmed the judgment; the Supreme Court granted review.

The Supreme Court used the case before it to engage in a wide-ranging discussion of the liability of certified public accountants to the various segments of the public who may come to rely on their audit reports. The court noted that an auditor reasonably may foresee an expansive distribution of an audit report by the audited company itself and by stockbrokers and institutional investors, with the result that the report may come into the hands of, and be used to make business or investment decisions by, "practically anyone." (*Bily, supra,* 3 Cal.4th at p. 390.) The problem before the court was to weigh the "conceivably limitless scope of an accountant's [potential] liability to nonclients who may come to read and rely on audit reports, and the effect of tort liability rules on the availability, cost, and reliability of those reports," which fulfill an essential role in the business world. (*Id.* at pp. 376, 383.)

After surveying existing approaches to auditor liability, the court turned to the three tort causes of action involved in the case before it. For each type of tort the court set forth the requirements for imposing liability on negligent auditors.

In the case of a professional negligence cause of action, the court adopted a narrow rule. The court stated: "In our judgment, a foreseeability rule applied in this context inevitably produces large numbers of expensive and complex lawsuits of questionable merit as scores of investors and lenders seek to recoup business losses. In view of the prospects of vast if not limitless liability for the 'thoughtless slip or blunder,' the availability of other efficient means of self-protection for a generally sophisticated class of plaintiffs, and the dubious benefits of a broad rule of liability, we opt for a more circumscribed approach." (*Bily, supra,* 3 Cal.4th at p. 406.)

The "circumscribed" rule adopted by the court was stated succinctly: "an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services." (*Bily, supra,* 3 Cal.4th at p. 406.) The court also noted that an audit engagement contract "might expressly

identify a particular third party or parties so as to make them" the "practical and legal equivalent of 'clients.' " (*Id.* at pp. 406-407, fn. 16.) However, the court continued, "we have no occasion to decide [in the present case] whether and under what circumstances [such] express third party beneficiaries of audit engagement contracts may recover as 'clients' under our holding." (*Ibid.*)

 The court then turned to the cause of action for negligent misrepresentation, which it carefully distinguished from the tort of negligence. (*Bily, supra,* 3 Cal.4th at p. 407.)[2] As to negligent misrepresentation, the auditor's potential liability extends beyond "clients." Instead, it extends to a third party if the auditor "intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction identified" to the auditor. (*Id.* at pp. 392, 408.) This extension of potential liability "attempts to identify those situations in which the [auditor] undertakes to supply information to a third party whom he or she knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the [auditor] to assess the risk of moving forward." (*Id.* at p. 409.)

The *Bily* court emphasized that the "intends to benefit" requirement establishes an objective standard that "looks to the specific circumstances (e.g., [auditor]-client engagement and the [auditor's] communications with the third party) to ascertain whether [an auditor] has undertaken to inform and guide a third party with respect to *an identified transaction or type of transaction.* If such a specific undertaking has been made, liability is imposed on the [auditor]. If, on the other hand, the [auditor] 'merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated,' the [auditor] bears no legal responsibility." (*Bily, supra,* 3 Cal.4th at p. 410, italics in original.)

"If competent evidence does not permit a reasonable inference that the auditor supplied its report with knowledge of the existence of a specific transaction or a well-defined type of transaction which the report was intended to influence, the auditor is not placed on notice of the risks of the audit engagement. In such cases, summary adjudication will be appropriate because plaintiff will not, as a matter of law, fall within the class of intended beneficiaries." (*Bily, supra,* 3 Cal.4th at pp. 414-415.)

 Finally, the court addressed the intentional misrepresentation cause of action. In this situation, liability may arise when an auditor makes a

---

[2]The primary distinction, as important in the present case, is that in a negligent misrepresentation action, justifiable reliance on the false statement is indispensable, whereas such reliance in a negligence case only arises as a facet of the causality issue. (*Bily, supra,* 3 Cal.4th at p. 413.)

fraudulent misrepresentation, that is, when the auditor knows its representations are false or baseless, or if the auditor has no belief in the truth of the representations, making them recklessly and without knowing whether they are true or false. If the auditor makes such a fraudulent misrepresentation to the plaintiff or a class of persons to which the plaintiff belongs (the general public may be such a class) intending or reasonably expecting such persons to rely on the misrepresentation, the auditor may be liable to a plaintiff who is actually misled by the misrepresentations. (*Bily, supra*, 3 Cal.4th at p. 415.) The broadened class of persons to whom the auditor may be liable is justified because the auditor's fraudulent conduct "thrusts [the auditor] into a primary and nefarious role in the transaction." (*Ibid.*)

## C. *Appellants' Professional Negligence Cause of Action*

■ In appellants' opening brief, they contend Mariani should have been permitted to pursue his general negligence claim. Appellants first contend Mariani "was precisely the person 'who contract[ed] for or engage[d] the audit services,' " making him respondent's actual client within the meaning of *Bily*. (See 3 Cal.4th at p. 406.)

There was no allegation in the second amended (or any other) complaint that Mariani, as an individual or as general partner of one of the guarantor partnerships, engaged respondent's services. To the contrary, the second amended complaint explicitly alleged (and the record in connection with the summary judgment motion confirms): "AWB engaged defendant . . . to perform accounting services for AWB, including an audit of AWB's books and records, according to generally accepted accounting principles." Mariani was not respondent's client.

Appellants also now claim, "Mariani was expressly named in the engagement contracts issued by . . . Price Waterhouse," thereby bringing him within the class of "practical and legal equivalent of 'clients.' " (See *Bily, supra*, 3 Cal.4th at p. 406, fn. 16.) Although this is not alleged in the complaint, appellants cite to the summary judgment record, impliedly arguing they should have been permitted to amend the negligence cause of action. Appellants' record citations fail to support their argument.

The first citation is to a letter from Price Waterhouse to "Mr. David W. Mariani, Chairman of the Board of Directors, American Western Banker, Inc." The letter begins: "Subsequent to the submission of our proposal to serve American Western Banker as independent accountants . . . ." There is no mention in the letter of serving *Mariani* in any personal capacity or as guarantor; in fact, the letter does not refer to Mariani in any way beyond the formal greeting.

The second record citation pertains to the initial proposal from Price Waterhouse. Again, this letter is addressed to Mariani as chairman of the board of AWB. It welcomes "this opportunity to present to you and the Board of Directors our qualifications to serve as independent accountants for" AWB. The letter touts respondent's ability "to provide AWB with the highest level of professional services." Mariani's name does not appear after the greeting; instead, the letter concludes with assurances respondent can "meet AWB's objectives and requirements" and "serv[e] AWB's needs."

Next, appellants cite to a letter from Deloitte, not respondent. Directed to Mariani as chairman of the board, the letter says: "Please be assured that we are anxious to serve the needs and address the concerns of the Board." Once again, a full reading of the letter demonstrates no mention of Mariani individually or as a guarantor.

The final record citation, a letter by Deloitte to Mariani as "Audit Committee Chairman, American Western Banker Co. Inc." states that Deloitte's manager has enclosed a booklet that "will be of interest and assistance to you in your duties as Audit Committee Chairman." The letter implies that Mariani had contacted Deloitte in his role as audit committee chairman to ask certain questions about the 1981 audit. It neither states nor implies anything about Mariani's role as guarantor of AWB corporate debt.

Appellants make other statements attempting to show Mariani was intimately involved in hiring respondent and receiving respondent's work product. While the record citations do largely support the idea of Mariani's involvement with respondent, such involvement uniformly is in his capacity as a director of AWB, not personally and not as a guarantor of its debt.

There is no reasonable possibility appellants could further amend their complaint to allege that Mariani was respondent's "client" or client equivalent within the meaning of *Bily*. (See *Silva* v. *Block* (1996) 49 Cal.App.4th 345, 349 [56 Cal.Rptr.2d 613]; *Smith* v. *County of Kern* (1993) 20 Cal.App.4th 1826, 1832 [25 Cal.Rptr.2d 716].) The court properly sustained the demurrer to the negligence cause of action and properly denied leave to amend.

D. *Appellants' Breach of Contract Cause of Action*

██ The trial court sustained respondent's demurrer to the breach of contract count, concluding appellants had not adequately alleged their third party beneficiary status under the audit engagement contract. As relevant to the issues on appeal, the breach of contract count first alleged respondent

and AWB "entered into a written contract under which defendant agreed to perform accounting services for AWB . . . ." It then alleged: "Plaintiffs were direct third party beneficiaries of this contract by virtue of MARIANI'S status as Chairman of the Board, and plaintiffs' status as major shareholders and guarantors of substantial debts of AWB. . . . PRICE WATERHOUSE understood that plaintiffs would (and intended to) benefit from its issuance of audit options [*sic*] in 1984, 1985, and 1986 because PRICE WATERHOUSE knew, or reasonably should have known, that plaintiffs, as guarantors, would have not agreed [*sic*] to continue to guarantee substantial debts of AWB or to renew those guarantees, if they had known the true . . . financial condition of the company."

Appellants contend they adequately alleged a third party beneficiary basis for their breach of contract claim and that nothing in *Bily* requires a contrary conclusion.

As we have noted above, *Bily* directly concerned only tort causes of action: "We granted review to consider whether and to what extent an accountant's *duty of care* in the preparation of an independent audit of a client's financial statements extends to persons other than the client." (*Bily*, *supra*, 3 Cal.4th at p. 375, italics added; *id.* at p. 376 ["difficult questions concerning . . . the effect of tort liability rules on the availability, cost, and reliability of (audit) reports"].) Somewhat cryptically, however, the *Bily* opinion also notes that third party beneficiaries of a contract "may under appropriate circumstances possess the rights of parties to the contract. . . . [W]e have no occasion to decide [in the present case] whether and under what circumstances express third party beneficiaries of audit engagement contracts may recover as 'clients' under our holding." (*Id.* at pp. 406-407, fn. 16.)

We must consider what, if anything, this statement means in relationship to breach of contract claims against auditors. Appellants contend, first, that *Bily* did not intend to change the law concerning breach of contract claims by third party beneficiaries so as to permit recovery only by one who is expressly named as a third party beneficiary in the contract. Second, they contend the trial court found that *Bily* did intend to restrict third party contract claims to persons expressly named in the contract.

Appellants' second contention clearly is wrong. In sustaining the demurrer, the trial court stated: "The Complaint fails to adequately allege that plaintiffs were *express or implied* third party beneficiaries . . . under the standards set forth in Cal. Civil Code § 1559, *Bily*, . . . and [the earlier

opinion in the present case]."[3] (Italics added.) The trial court did not sustain the demurrer on the basis that the complaint lacked an allegation that appellants appeared by name in the engagement contract.

The validity of appellants' first contention, that *Bily* did not intend to change the traditional law of third party beneficiaries, is more plausible. In the first place, of course, the court expressly declined to resolve the issue.

Second, the *Bily* court did not distinguish between the tort and contract rights of third party beneficiaries. It simply noted that third party beneficiaries may "possess the rights of parties to the contract." (*Bily, supra,* 3 Cal.4th at p. 406, fn. 16.) Those rights traditionally have been thought to arise both under the law of contract and in tort. (See *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 589, fn. 2, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) That is, the contract can create both contract rights in, and a legal duty of care to, a third party. (*North American Chemical Co.* v. *Superior Court* (1997) 59 Cal.App.4th 764, 775 [69 Cal.Rptr.2d 466].) *Outdoor Services, Inc.* v. *Pabagold, Inc.* (1986) 185 Cal.App.3d 676 [230 Cal.Rptr. 73], cited as an example of a third party beneficiary case by the Supreme Court in *Bily, supra,* 3 Cal.4th at page 406, footnote 16, was a breach of contract case, not a negligence case, and it employed the traditional third party beneficiary analysis.

Third, even though *Bily* used the phrase "express" third party beneficiary, that phrase has long been a term of art in third party beneficiary cases; it does not appear *Bily* meant to create a new category of specifically designated beneficiaries, whether for tort or breach of contract purposes. (But see *Soderberg* v. *McKinney, supra,* 44 Cal.App.4th at p. 1774.) Thus, in *Outdoor Services* the court stated: "It is not necessary that an express beneficiary be specifically identified in the contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created." (*Outdoor Services, Inc.* v. *Pabagold, Inc., supra,* 185 Cal.App.3d at p. 681; see also *Lucas* v. *Hamm, supra,* 56 Cal.2d at p. 590.)

Although it is conceivable the court's language in *Bily*'s footnote 16 is a harbinger of a drastic new restriction in the law of third party beneficiaries, we think that possibility is remote. In any event, for present purposes we will assume appellants are correct; we will assume *Bily* did not narrow the traditional principles of third party beneficiary law in the context of auditor liability, at least as to breach of contract actions. (Cf. *Soderberg* v. *McKinney, supra,* 44 Cal.App.4th at p. 1774.)

That assumption, however, does not aid appellants. As the trial court found, the second amended complaint does not adequately allege appellants

[3]Civil Code section 1559 states: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

were third party beneficiaries of the contract even under the traditional test, when that test is applied in the context of audit reports. We will explain.

Two aspects of audit reports provided the foundation upon which the *Bily* court constructed its opinion. Each of these aspects necessarily has an impact on an analysis of the third party beneficiary issue in audit report cases.

The first significant aspect of the auditor-client relationship is that, in ordinary circumstances, the audit report is not produced, in fact, *for* the third parties who may ultimately be influenced by the report. Rather, the client company is the entity for whom the audit report is produced and to whom it is addressed and delivered. As *Bily* said: "The client, of course, has interests in the audit that may not be consonant with those of the public. 'Management seeks to maximize the stockholders' and creditors' confidence in the company . . . ; whereas, the public demands a sober and impartial evaluation of fiscal performance.' [Citation.]" (*Bily, supra,* 3 Cal.4th at pp. 399-400.) In other words, the client purchases an audit report and, to the extent the report is favorable to it, disseminates the report for its own purposes[4] as "an admission ticket to venture capital markets" or to "establish [its] credibility" with potential investors and creditors. (3 Cal.4th at pp. 381-382.) The client usually selects and pays the auditor, "furnishes the information base for the audit," and controls dissemination of the audit report. (*Id.* at pp. 399-400.) Although the auditor is governed by certain rules requiring independence and thoroughness that enhance the convincing force of the audit report (see *id.* at pp. 380-383), the audited company is the auditor's customer.[5]

▆ The second important aspect of audit reports, somewhat paradoxically, is the *public function* of the independent auditor's report. (See *Bily, supra,* 3 Cal.4th at p. 383.) As the *Bily* court stated, "audits of financial statements and the resulting audit reports are very frequently (if not almost universally) used by businesses to establish the financial credibility of their enterprises in the perceptions of outside persons, e.g., existing and prospective investors, financial institutions, and others who extend credit to an enterprise or make risk-oriented decisions based on its economic viability."

---

[4]Companies that issue federally registered securities may be *required* to file audited financial statements in some circumstances. Such audits may be the basis for statutory liability to third parties who buy or sell shares in the company in reliance on an audit not prepared "in good faith and [without] knowledge that such [audit report] was false or misleading." (15 U.S.C. § 78r(a), quoted in *Bily, supra,* 3 Cal.4th at p. 396.) The present case does not involve such a company. (See also *Arthur Andersen* v. *Superior Court* (1998) 67 Cal.App.4th 1481, 1491, 1507 [79 Cal.Rptr.2d 879] [insurance company required by statute to file annual independent audit with Insurance Commissioner; liability to Insurance Commissioner exists under *Bily*].)

[5]This relationship is exemplified in the language used by the auditors in their communications with AWB in the present case.

(*Id.* at p. 382.) The audit report is " 'a principal means of communicating accounting information to those outside an enterprise.' " (*Id.* at p. 383.)

As a result of this public function of the audit report, an exceptional degree of third party impact is necessarily foreseeable in the contractual relationship for audit services—the potential for widespread third party impact indeed is *inherent* in every such contract between an auditor and its client.[6] The practical point suggested by *Bily* is that, given this "conceivably limitless" (3 Cal.4th at p. 376) class of persons who legitimately rely on any particular audit report, some additional factors must be present if any persons from within this broad class will be contractually entitled to rely on the report arising from a particular engagement for audit services. The class of *inherent* third party beneficiaries is not the class of *express* third party beneficiaries, or else the distinction between incidental and express beneficiaries (see Rest.2d Contracts, § 302) would lose all meaning in the audit report context.

Thus, we conclude, in keeping with *Bily*, that as a matter both of policy and of reality there are no "express third party beneficiaries" of an ordinary, white-bread audit engagement contract. There are only incidental beneficiaries who have no legal rights arising from the contract.

■ We then come to the question whether the second amended complaint alleges any facts that would permit an inference that respondent's services were performed pursuant to a contract that was out of the ordinary—that established appellants as third party beneficiaries. Phrased in terms of the traditional test for express third party beneficiary status, were facts alleged to show that AWB clearly manifested an intent to benefit appellants and that respondent understood that AWB had such intent? (*Lucas* v. *Hamm, supra,* 56 Cal.2d at p. 591; *Sofias* v. *Bank of America* (1985) 172 Cal.App.3d 583, 587 [218 Cal.Rptr. 388].)

As noted, the second amended complaint alleged that appellants were "direct third party beneficiaries of [the audit engagement] contract by virtue of MARIANI's status as Chairman of the Board, and plaintiffs' status as major shareholders and guarantors of substantial debts of AWB." It also alleged respondent knew or should have known appellants would not have "agreed to continue to guarantee substantial debts of AWB or to renew those guarantees" if they had known the true financial condition of AWB. On their

---

[6]This factor distinguishes the present case from *Anderson* v. *Deloitte & Touche* (1997) 56 Cal.App.4th 1468 [66 Cal.Rptr.2d 512]. In that case, the accountant's projections of earnings were "designed for the specific purpose of attracting investors in the limited partnerships, i.e., to induce reliance, and [could not] reasonably be understood to have [had] any other purpose." (*Id.* at p. 1478.)

face, these allegations fail to distinguish appellants from the class of persons who normally rely on audit reports: no investor, creditor, shareholder or guarantor would act in the same manner toward an insolvent business as it would toward a thriving business, and any reasonable auditor would know that.

Appellants present no reasoned argument to show how the allegations might permit an inference of express third party beneficiary status. Thus, even though appellants articulate a reliance on the traditional law of third party beneficiary actions, strikingly absent from their briefs is any discussion whatsoever of that body of law. Instead, they merely state that a third party need only "demonstrate that he is a member of the class of persons for whom the contract was made." That statement clearly is true (see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 666, p. 604), but it does not help us determine whether the complaint actually demonstrates the fact in question.

In the absence of a reasoned argument by appellants concerning the manner in which they contend AWB's contract with respondent differs from the ordinary audit contract, we are unable to delineate and consider every conceivable way in which the evidence might, but fails to, establish that appellants were third party beneficiaries. We will, however, survey the obvious contenders.

There is a complete absence of any allegation in the complaint (or evidence in the record) of any formal or informal contract in which AWB agreed to provide an audit report to appellants as a condition of their agreement to guarantee or continue to guarantee AWB's debts. By contrast, in *COAC, Inc.* v. *Kennedy Engineers* (1977) 67 Cal.App.3d 916, 919-920 [136 Cal.Rptr. 890], such an agreement was found. In that case, COAC contracted with a water district to build a treatment facility for the district. The appellate court found the district had an implied duty under the contract to provide an environmental impact report (EIR) to facilitate the plaintiff's construction of the project. The district retained defendant to prepare the EIR. Defendant's failure to prepare a competent EIR allegedly caused delay in the construction project, thereby injuring plaintiff. In reversing an order sustaining the defendant's demurrer without leave to amend, the appellate court held that the duty running from the district to the plaintiff was sufficient to support an amendment of the complaint to allege that the plaintiff was a third party beneficiary of the district's contract with the defendant. (See Rest.2d Contracts, § 302, subd. (1).) No undertaking, contractual or otherwise, for AWB to supply audit reports to appellants is reasonably inferable from the present record.

Similarly, there is no allegation (or evidence) that the audit contract contemplated that respondent would provide audit reports or financial advice directly to appellants, whether described individually or as part of a class. By contrast, in *Harper* v. *Wausau Ins. Co.* (1997) 56 Cal.App.4th 1079, 1089 [66 Cal.Rptr.2d 64], the appellate court found that the defendant did agree to provide benefits directly to third persons. In that case, a property owner had obtained premises liability insurance from defendant. The insurance included liability coverage for the owner, but also included a provision to pay the medical costs of any person injured on the property, regardless of fault. The plaintiff was injured while on the property and sued the defendant insurer under the owner's insurance policy for her medical costs. Because the medical benefits coverage was provided regardless of the property owner's fault, the appellate court concluded the plaintiff was a member of a class of persons who were the express third party beneficiaries of the insurance policy: the "medical coverage provisions provide direct obligations on the part of the insurer to the intended beneficiaries."

Nor does the case before us present any allegations (or evidence) from which one reasonably could infer that AWB intended the audit report (as opposed to the generalized body of knowledge and information Mariani and Benham obtained about AWB through their roles as directors and stockholders) to guide any decisions appellants might make as guarantors of corporate lines of credit. By contrast, in *Alling* v. *Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1440 [7 Cal.Rptr.2d 718], the court found evidence that supported an inference that a party which contracted with the defendant intended its contract to benefit the plaintiff. In *Alling*, the contracting parties' course of conduct established that a patent licensee intended the plaintiff, licensor of the patent, to benefit from the licensee's best efforts contract with the manufacturer-defendant when the licensor entered into its own licensing agreement with defendant. Even though the plaintiff conceded the defendant had not breached the licensing agreement between them, the appellate court concluded the plaintiff's suit alleging breach of the defendant's "best efforts" obligations under the licensee's contract was proper. (*Id.* at p. 1441.)

Finally, there was no allegation (or evidence) that the course of dealing between AWB and respondent permitted an inference that AWB intended to use the audit report to influence appellants in any particular transaction or type of transaction. By contrast, in *Soderberg* v. *McKinney, supra,* 44 Cal.App.4th 1760, the case upon which the appellants extensively rely, the evidence permitted a reasonable inference that the defendant knew the plaintiffs or someone like the plaintiffs would rely on the work product in making a particular investment decision. The defendant was a real estate

appraiser. According to the plaintiffs' evidence, the defendant had prepared appraisal reports on approximately 200 properties for a particular mortgage broker, who in turn gave the appraisals to prospective lenders. On occasion, the broker contacted the defendant with questions from prospective lenders concerning the appraisal reports. The plaintiffs were private lenders who had received one of the defendant's appraisal reports from the broker and relied on the appraisal in making a loan secured by the appraised property. (*Id.* at p. 1771.) The defendant submitted evidence in support of his motion for summary adjudication of the plaintiffs' breach of contract claim that indicated the defendant did not know the appraisal would be passed on by the broker and that the appraisal report itself stated it was for the use of the broker only. (*Id.* at p. 1770.)

The appellate court reversed the trial court's order granting summary adjudication. Impliedly finding that the plaintiffs' evidence supported a reasonable inference that the plaintiffs belonged to a class for whose express benefit the contract was made (*Soderberg* v. *McKinney, supra,* 44 Cal.App.4th at p. 1774), the court remanded the matter for the trial court "to rule on plaintiffs' request that they be granted leave to amend the complaint to allege a third party beneficiary theory on the contract claim." (*Id.* at p. 1775.) No similar course of dealing between AWB and respondent is inferable from the present record, nor is there any evidence that appellants received any of respondent's audit reports in conjunction with a particular transaction or type of transaction.

The complaint establishes (and the evidence confirms) that appellants were nothing more than incidental beneficiaries of the audit engagement contract; as such they are not entitled to sue for breach of the contract. (*Sofias* v. *Bank of America, supra,* 172 Cal.App.3d at p. 587.)

### E. *Appellants' Negligent Misrepresentation Cause of Action*

 The trial court granted summary adjudication on appellants' negligent misrepresentation cause of action. In reviewing this ruling, we accept as true the evidence presented by the party opposing the motion. (*Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].) We construe the declarations of the opposing party liberally and resolve in favor of the opposing party all doubts as to whether any material, triable issues of fact exist. (*Pensinger* v. *Bowsmith, Inc.* (1998) 60 Cal.App.4th 709, 717 [70 Cal.Rptr.2d 531].)

 The trial court stated two separate reasons for granting the summary adjudication motion. First, the court concluded appellants did not

actually rely, as required by *Bily*, on respondent's audit reports or other information supplied by it: the lines of credit appellants guaranteed had been fully drawn down by the time respondent was hired as AWB's auditor and thereafter appellants incurred no new guaranty obligations. (See *Bily*, *supra*, 3 Cal.4th at p. 409 [liability limited "to cases in which the supplier [of audit information] '*manifests* an intent to supply the information for the *sort of use* in which the plaintiff's loss occurs.' " (Original italics.)].) Second, the trial court ruled that respondent did not intend to induce appellants to act in reliance on respondent's representations as required by *Bily* because, inter alia, appellants did not establish that there was any guaranty transaction respondent knew about and intended to influence. (See *id.* at p. 414 ["If competent evidence does not permit a reasonable inference that the auditor supplied its report with knowledge of the existence of a specific transaction or a well-defined type of transaction which the report was intended to influence," summary adjudication for auditor is appropriate].)

Appellants disagree with both of the trial court's conclusions. They contend they relied on respondent's audit reports in deciding not to oust or more closely supervise management, and in renegotiating certain of their guaranties of AWB's debt.

The decisions to retain current management and to let it proceed without closer supervision were decisions that could only be taken by the board of directors, not by guarantors of the corporate debt. Appellants recognize this, but they contend it is immaterial what capacity they acted in when they relied—the important fact is that *they* acted in reliance.

Appellants' argument ignores the context in which the showing of reliance must be made in a third party suit against an auditor. *Bily* emphasizes that the duty of the auditor to a third party can only arise if the auditor "intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction identified" to the auditor. (*Bily*, *supra*, 3 Cal.4th at pp. 392, 408.) This test for potential liability "attempts to identify those situations in which the [auditor] undertakes to supply information to a third party whom he or she knows is likely to rely on it in a transaction that has sufficiently specific economic parameters to permit the [auditor] to assess the risk of moving forward." (*Id.* at p. 409.) The reason why it makes a difference what role Mariani and Benham occupied in firing or not firing management is that firing management is not a "transaction or type of transaction" that *guarantors* can undertake. Thus, "guarantors might fire managers" is not a transaction with specific economic parameters to permit respondent "to assess the risk of moving forward" (*ibid.*); it is not the "sort of use" to which a guarantor may put information. (See *ibid.*)

Justifiable reliance can only arise in the context of the duty existing between the parties. (See *Bily, supra,* 3 Cal.4th at p. 408.) In other words, only to the extent appellants relied *as guarantors* did they rely at all, for purposes of the limited causes of action still viable after our decision in *American Western Banker* v. *Price Waterhouse, supra,* 12 Cal.App.4th at page 51. The trial court was correct in concluding that appellants' retention of the management team in reliance on the audit report did not constitute cognizable reliance for purposes of the present action.

Appellants also contend the evidence shows they acted in reliance on the audit reports *as guarantors* when Mariani Investment Partnership signed a guaranty with B.A. Leasing Corporation (BALCO) after issuance of the 1984 audit report and Mariani signed a new guaranty with Wells Fargo Bank (Wells Fargo) after issuance of the draft 1985 audit report. Neither argument is convincing.

A general partner, of course, is liable for all debts of a partnership. (*Home Federal Savings & Loan Assn.* v. *Ramos* (1991) 229 Cal.App.3d 1609, 1614 [284 Cal.Rptr. 1].) Mariani was general partner of the Mariani Children's Investment Partnership; he executed the original BALCO guaranty in 1980 on behalf of the partnership. The Mariani Children's Investment Partnership changed its name to Mariani Investment Partnership, one of the present appellants. In 1985, Mariani signed, on behalf of Mariani Investment Partnership, a replacement guaranty for the BALCO line of credit. No new debt was guaranteed and Mariani's exposure was in no way increased.

Inexplicably, and despite the fact that the 1985 guaranty was a mere formality that changed none of the existing legal relationships, appellants argue that the guaranty shows justifiable reliance on respondent's 1984 audit report because "Mariani did not take steps to either resign as a general partner of the Mariani Investment Partnership or enter into a serious renegotiation workout arrangement with BALCO." "Indeed," appellants continue, "if [Mariani] merely resigned as general partner, that act alone would have eliminated his liability to BALCO because the partnership was the only guarantor to that bank. See Corporations Code section 15015(b)."

The citation to Corporations Code section 15015, subdivision (b), is inexplicable because that subdivision deals with the liability of partners in a registered limited liability partnership, as defined in Corporations Code section 15002, subdivision (i)(1)(C). It has no applicability whatsoever to general partners. Rather, pursuant to Corporations Code section 15015, subdivision (a)(2), a general partner is liable for all debts of the partnership.

The reference to a failure to "enter into a serious renegotiation workout arrangement with BALCO" is inexplicable because there is no evidence whatsoever of the existence of an opportunity for such a workout of which appellants failed to avail themselves, much less of a workout opportunity that would have reduced the amount Mariani paid to BALCO.

Appellants also contend they relied on respondent's 1984 and 1985 (draft) audit reports in entering into the restructuring agreement with Wells Fargo in 1986. However, appellants fail even to argue, much less to show from the evidence, any manner in which the restructuring agreement adversely affected the legal rights of appellants or any of them. (See *Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601] ["Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct *which altered his or her legal relations*" (italics added)].) It is true that the restructuring agreement made Mariani's obligations to Wells Fargo "unequivocal," as appellants argue. But Mariani's obligations to Wells Fargo already were unequivocal under the terms of the guaranty Mariani executed in 1982, long before respondent came on the scene.

Viewed in this context, the analysis never reaches the question whether Mariani reasonably could not have known about AWB's financial condition by the time it entered into the restructuring agreement in February of 1986. While Mariani may have "acted" in a factual sense when he signed the restructuring agreement, he did not "rely" in a legal sense because he did not alter his legal relations with Wells Fargo. The guaranty Mariani signed in 1986 was essentially in the same terms as the original 1982 guaranty, except that the maximum amount of the 1986 guaranty included accrued, unpaid interest that was payable but unliquidated under the terms of the 1982 guaranty.[7]

Viewed in this context, as well, it is apparent the trial court's second reason for granting summary adjudication was correct: respondent did not intend to induce appellants to act in reliance on its representations in any

[7]Because Mariani "unconditionally guarantee[d] and promise[d] to pay" AWB's debts to Wells Fargo under both guaranties, it simply does not matter whether Mariani thought, in 1986, that the assets of AWB would satisfy the Wells Fargo debt, whether that thought was based on respondent's audit report, and whether that thought was reasonable in light of the circumstances known to Mariani at the time of the 1986 restructuring agreement. Neither does it matter that, as appellants' accounting expert stated in his declaration, "Price Waterhouse influenced the making of personal guarantees by Mariani in connection with work-outs and restructurings . . ." because those decisions did not constitute reliance in the legal sense. Because of our resolution of this issue, it is not necessary that we consider appellants' claim that the trial court erred in concluding that any possible reliance on the 1985 audit report would have been unjustified given Mariani's state of knowledge by the time the report issued.

specific transaction or type of transaction because there is no evidence any such material transaction occurred, or even was contemplated.[8]

Accordingly, we conclude the trial court correctly granted summary adjudication in favor of respondent on appellants' negligent misrepresentation cause of action.

### F. Appellants' Intentional Misrepresentation Cause of Action

■ The trial court granted summary adjudication of appellants' intentional misrepresentation cause of action on the basis that appellants did not actually rely on any of respondent's representations—in other words, on the first basis for which it granted summary adjudication of the negligent misrepresentation count. An intentional misrepresentation cause of action requires the same element of reliance as does a cause of action for negligent reliance. (See *Bily, supra,* 3 Cal.4th at p. 415.)

Appellants present no separate argument concerning actual reliance in the context of their intentional misrepresentation argument. In our view, the issues and inquiry are identical in both contexts. Accordingly, it suffices to say that we conclude in the present context, as well, that appellants did not show they relied on respondent's representations in the legal sense of reliance. Actions appellants took after receiving respondent's reports did not

---

[8]Appellants' argument consistently goes astray when it restates the *Bily* requirements. Thus, in their opening brief appellants state: "All that *Bily* requires is that plaintiffs establish that Price Waterhouse knew with substantial certainty that plaintiffs, or the particular class of persons to which they belonged, would rely on the accountants' representations in the course of their transactions involving AWB." (Subsequently, they reduce their statement of the *Bily* requirement even further, simply calling it the "intent to influence" requirement.) Appellants cited to page 414 of the *Bily* opinion as the source of this requirement. As we have repeatedly emphasized in this opinion, *Bily,* at page 414 and elsewhere, requires not just an intent to influence appellants' actions "in their transactions with AWB," but rather an intent to influence actions " 'in a specific transaction, or a specific type of transaction' " or "a specific transaction or a well-defined type of transaction." (*Bily, supra,* 3 Cal.4th at p. 414.)

In *Soderberg* v. *McKinney, supra,* 44 Cal.App.4th at pages 1766-1768, upon which appellants rely heavily, the real estate appraisal was submitted to a mortgage broker in circumstances that reasonably permitted an inference that a potential lender would rely on the report in making a loan on that property. There is no indication the result in *Soderberg* would have been the same if the mortgage broker managed the property as a rental agent and wanted the appraisal to obtain insurance on the property, challenge the assessed tax valuation, specify limits of indemnity by a movie producer who wanted to film scenes in the house, list the house for sale, and, in addition, seek new financing for the owners of the house. In such circumstances, *Bily* would require a conclusion the appraiser was not liable for an insurance agent's reliance on the appraisal report, nor for a lender's reliance on it, even if the appraiser knew generally that the broker would use the appraisal for some purpose.

This point is particularly pertinent in light of the absence of any evidence whatsoever that respondent knew Mariani contemplated attempting to restructure his debt with Wells Fargo at the time it provided information to Mariani, whether as a director or otherwise.

change their legal relationship with AWB's creditors, so those actions did not constitute legal reliance on the representations.

## G. *Conclusion*

The trial court properly sustained respondent's demurrer to the second amended complaint as to appellants' negligence and breach of contract causes of action. The court properly granted summary adjudication on the negligent misrepresentation count of the third amended complaint because appellants did not demonstrate a reasonable inference that respondent intended to influence them in any identifiable transaction or type of transaction. The court properly granted summary judgment on the intentional misrepresentation cause of action of the third amended complaint because respondent presented evidence to establish that appellants did not rely on respondent's representations in any guaranty or guaranty-related transaction that altered appellants' legal relationships.

### *Disposition*

The judgment is affirmed. Respondent is awarded its costs on appeal.

Ardaiz, P. J., and Harris, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 28, 1999.