# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS A. PAULSEN,
                    *Plaintiff,*

EDWARD L. FRAZEE; CHESTER
MADISON,
                    *Plaintiffs,*

LLOYD MICHAEL O'CONNELL, III,
individually and on behalf of a
class of all other persons similarly
situated,
                    *Plaintiff,*

          and

ROBERT M. BOWDEN,
                    *Plaintiff-Appellant,*

ROBERT J. NEWELL,
                    *Plaintiff-Appellant,*

          v.

CNF INC.; CNF SERVICE COMPANY
INC.; ADMINISTRATIVE
COMMITTEE OF THE CONSOLIDATED
FREIGHTWAYS CORPORATION PENSION
PLAN; STEPHEN D. RICHARDS; JAMES
R. TENER; ROBERT E. WRIGHTSON;
TOWERS, PERRIN, FORSTER &
CROSBY, INC.; PENSION BENEFIT
GUARANTY CORPORATION,
                    *Defendants-Appellees.*

No. 07-15142

D.C. No.
CV-03-03960-JW

THOMAS A. PAULSEN; ROBERT M.
BOWDEN; EDWARD L. FRAZEE;
ROBERT J. NEWELL; LLOYD MICHAEL
O'CONNELL, III, individually and
on behalf of a class of all other
persons similarly situated; CHESTER
MADISON,
                   *Plaintiffs-Appellants,*

                   v.

CNF INC.; CNF SERVICE COMPANY
INC.; ADMINISTRATIVE
COMMITTEE OF THE CONSOLIDATED
FREIGHTWAYS CORPORATION PENSION
PLAN; STEPHEN D. RICHARDS; JAMES
R. TENER; ROBERT E. WRIGHTSON;
TOWERS, PERRIN, FORSTER &
CROSBY, INC.; PENSION BENEFIT
GUARANTY CORPORATION,
                   *Defendants-Appellees.*

No. 07-15389

D.C. No.
CV-03-03960-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted
August 11, 2008—San Francisco, California

Filed March 20, 2009

Before: Eugene E. Siler, Jr.*, M. Margaret McKeown, and
Consuelo M. Callahan, Circuit Judges.

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

Opinion by Judge Callahan

## COUNSEL

Teresa S. Renaker, Lewis, Feinberg, Lee, Renaker & Jackson, P.C., on behalf of plaintiffs-appellants Thomas A. Paulsen, Robert M. Bowden, Edward L. Frazee, Chester Madison, Robert Newell, and Lloyd Michael O'Connell III.

David L. Bacon, Thelen Reid Brown Raysman & Steiner LLP, on behalf of defendants-appellees CNF Inc. and CNF Service Co., Inc.

Gary S. Tell, O'Melveny & Meyers LLP, on behalf of defendants-appellees Stephen D. Richards, James R. Tener, Robert E. Wrightson, and the Administrative Committee of the Consolidated Freightways Corporation Pension Plan.

Robert E. Mangels and Susan Allison, Jeffer, Mangels, Butler & Marmano, LLP, on behalf of defendant-appellee Towers, Perrin, Forster & Crosby, Inc.

Charles L. Finke, on behalf of defendant-appellee Pension Benefit Guaranty Corporation.

**OPINION**

CALLAHAN, Circuit Judge:

Plaintiffs-Appellants are former employees ("the Employ-ees") of CNF Inc. ("CNF"), a supply chain management com-pany that underwent a substantial reorganization starting in 1996.[1] The Employees allege that as a result of CNF's reorga-nization, which included a "spinoff" of an underperforming division of CNF in which the Employees worked, their retire-ment benefits were substantially reduced. The spinoff created a new company, Consolidated Freightways Corporation ("CFC"). Concurrent with the division spinoff, CNF also spun off part of the defined benefit pension plan in which the Employees were participants, and the Employees became members in a new plan sponsored by CFC. These plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). In connection with the plan spinoff, CNF engaged the actuarial services of Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin") to value the benefit liabilities to be transferred to the CFC-sponsored plan and associated assets to be transferred to cover those liabilities. This was done to certify compliance with the requirement of ERISA § 208, 29 U.S.C. § 1058, that each participant in the spun-off plan would (if the plan then terminated) receive a benefit immediately after the spinoff equal to or greater than the ben-efit she would have been entitled to receive immediately before the spinoff (if the plan had then terminated). Towers Perrin also provided actuarial services to the new CFC-sponsored plan and certified for several years after the spinoff that the new plan was adequately funded.

After the spinoff, CFC declared bankruptcy and "distress terminated" its pension plan, which was then determined to be under-funded by roughly $216 million. The termination

---

[1]The defined term "Employees" refers to all Plaintiffs-Appellants in this case, which includes former employees and retirees.

resulted in a government corporation, the Pension Benefit Guaranty Corporation ("PBGC"), becoming trustee over the defunct plan. PBGC pays reduced benefits to participants of distress-terminated plans from assets pooled from all terminated plans.

The Employees sued CNF, CNF Service Co., the Administrative Committee of the CFC Pension Plan and its individual members ("Committee Defendants") for breaches of their ERISA-based fiduciary duties in connection with the spinoff.[2] The Employees also sued Towers Perrin for professional negligence under state law in valuing the plan liabilities to be transferred at spinoff and in repeatedly certifying post-spinoff that the new plan was adequately funded. Finally, the Employees sued PBGC, as trustee, for not pursuing claims against the other defendants in connection with the spinoff. The district court dismissed all of the Employees' claims on various grounds, and this appeal followed.

We affirm the district court in part, reverse it in part, and remand. We affirm the district court's dismissal of the Employees' ERISA-based claims because the Employees lack Article III standing to pursue several of those claims, and lack standing under ERISA to pursue others. We also affirm the dismissal of the claim against PBGC because PBGC's non-enforcement decisions are presumptively immune from judicial review, and the Employees cannot rebut that presumption. Finally, however, we hold that the Employees might be able to state a claim for professional negligence against Towers Perrin under California law and remand for further proceedings on a more developed factual record.

---

[2]For convenience, we refer to these defendants collectively as the "Fiduciary Defendants."

# I.

## A.

CNF is a supply chain management company that provides services including trucking and air freight transportation. CNF operated two trucking units that, over time, began directly competing with one another: the unionized CF MotorFreight and non-unionized Con-Way Transportation Services, Inc. ("Con-Way"). In 1994 and 1995, CF MotorFreight posted operating income losses in the range of $34.4 to $46.6 million dollars, while Con-Way posted operating income gains in the range of $96.5 to $111.2 million dollars. In December 1996, CNF spun off CF MotorFreight, and created a stand-alone, unionized trucking company called Consolidated Freightways Corporation, or CFC.

Before the spinoff, the Employees were in essence participants in a defined benefit plan sponsored by CNF called the CNF Inc. Retirement Plan ("CNF Plan"). In connection with the spinoff, CNF created the Consolidated Freightways Corporation Pension Plan ("CFC Plan"). CNF and CFC entered into an Employee Benefit Matters Agreement ("EBMA"), which "provided that CNF employees who became CFC employees as a result of the corporate spinoff also would become participants in the CFC Plan and that the CNF Plan would transfer to the CFC Plan all its obligations owing to those participants." Five of the six Employees who were active CNF employees at the time of the spinoff were transferred to CFC. The EBMA also transferred the benefits obligations of certain named retirees receiving pension benefits under the CNF Plan, including plaintiff Frazee, to the CFC Plan.

The EBMA provided that the CNF would transfer a portion of the CNF Plan's liabilities to the CFC Plan; these transferred portions would be the initial liabilities of the CFC Plan. It also required CNF to transfer assets to the CFC Plan "equal

to the present value of the CNF Plan accrued benefit liability for the transferred participants and retirees as of the date of the plan spinoff."[3]

Post-spinoff, the Committee Defendants administered the CFC Plan. The Committee Defendants consist of the Administrative Committee of the CFC Plan and CFC's officers who served on the committee. The committee's duties included retention of an enrolled actuary for the CFC Plan and establishment of a funding policy for the CFC Plan in consultation with the actuary.

**B.**

The Employees allege that Towers Perrin, a consulting firm, provided actuarial services to the CNF Plan and the CFC Plan for the benefit of plan participants starting in at least November 1996.[4] On November 1, 1996, CNF filed an IRS Form 5310-A (Notice of Plan Merger or Consolidation, Spin-off, or Transfer of Plan Assets or Liabilities), which it was required to file 30 days before the spinoff. As part of the filing, "Towers Perrin certified that participants in and beneficiaries of the new CFC Plan would be as well off on a termination basis in the CFC Plan as in the CNF Plan."[5] In

---

[3]The Employees allege that CNF Service Co., a subsidiary of CNF, provided plan administration services to the CFC Plan from 1996 to 1999 pursuant to a "Transition Services Agreement," but have not alleged facts regarding what services CNF Service Co. provided to the CFC Plan. The record contains this agreement and indicates that CNF Service Co. provided, in part, "[r]etirement and pension plan administration" services, but was expressly designated a non-fiduciary with only a ministerial role.

[4]It is unclear from the pleadings and the record on appeal exactly which entity retained Towers Perrin to render services to the CNF Plan and the CFC Plan. Towers Perrin contends in its Answering Brief that it "rendered services" to the plan sponsors, CNF and CFC.

[5]Form 5310-A requires that the filing party attach an "actuarial statement of valuation" showing compliance with Internal Revenue Code § 401(a)(12), which requires that "each participant in the plan would (if

January 1997, Towers Perrin filed an amended Form 5310-A certifying the transfer based on more optimistic assumptions about interest rates and expected retirement age, which would result in a lower amount of assets being transferred at spinoff.

Towers Perrin also provided actuarial services to the CFC Plan post-spinoff, "including valuing the Plan on an annual basis." The Employees allege "that in each year from 1997 through 2001, Towers Perrin determined that the CFC Plan was fully funded and that CFC had no obligation to contribute to the Plan."[6] This resulted in CFC making no contributions to the CFC Plan in these years.

## C.

In September 2002, CFC filed petitions for Chapter 11 bankruptcy. In January 2003, CFC informed the CFC Plan participants that the plan administrator would terminate the CFC plan in a "distress termination," effective March 2003, due to under-funding, and that the plan "would not have sufficient funds to pay all vested accrued benefits to all participants and beneficiaries" upon termination.[7] Specifically, CFC

the plan then terminated) receive a benefit immediately after the . . . transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the . . . transfer (if the plan had then terminated)."

Towers Perrin based its actuarial statement of valuation on certain assumptions, including (1) "future earnings of 6.9% per year," and (2) "a graded retirement rate used to calculate the expected retirement age of participants transferred to the new CFC Plan."

[6] For years 1997-1999, "Towers Perrin based its conclusions that the CFC Plan was fully funded on an expected retirement age of 64 and an assumed rate of return for plan funding of 8.5%." For years 2000-2001, Towers Perrin based its adequate funding conclusions "on an expected retirement age of 62 and an assumed rate of return for plan funding of 8.5%."

[7] A "distress" termination is a voluntary termination event that occurs when the plan is not sufficiently funded to meet benefit liabilities as of the date of termination and is thus not eligible for standard termination. 29 U.S.C. § 1341(c).

estimated that "approximately 8% of current retirees would have their benefit amounts reduced under PBGC's maximum monthly benefit limits."[8]

PBGC assumed trustee responsibility for the CFC Plan in June 2003, and "estimated that the [CFC] Plan had approximately $228 million in assets to cover approximately $504 million in vested accrued benefits."[9] This represents an approximate 55% shortfall in funding. Under the benefit payment limits set by PBGC, the Employees suffered dramatic reductions in their pension benefits. PBGC, however, declined to file a civil action against CNF, CNF Service Co., the Committee Defendants, or Towers Perrin.

## D.

This case has a complicated and tortured procedural history, with several amended complaints and motions to dismiss. We recount the procedural history here to provide adequate background for this appeal.

## 1.

In 2003, the Employees filed a Complaint alleging seven

---

[8]Although the label "current retirees" is ambiguous given the two sets of plan participants represented by the appellants here, it appears the parties agree that the 8% figure represents the entire class of plan participants and retirees that saw reduced benefits as a result of the distress termination of the CFC Plan.

[9]Created by ERISA, *see* 29 U.S.C. §§ 1301-1461, PBGC protects the retirement incomes from American workers' private-sector defined benefit pension plans. PBGC was created "to encourage the continuation and maintenance of private-sector defined benefit pension plans," provide timely and uninterrupted payment of pension benefits, and keep pension insurance premiums at a minimum. PBGC pays monthly retirement benefits, up to a guaranteed maximum, which is set by law and adjusted annually. *See* PBGC Mission Statement, *available at* http://www.pbgc.gov/about/about.html#1 (last visited March 13, 2009).

claims for relief: five ERISA-based claims against CNF, CNF Service Co., and the Committee Defendants (collectively, the "Fiduciary Defendants"); and two claims for professional negligence under California law against Towers Perrin. The district court granted the Defendants' motions to dismiss.

The district court granted CNF and CNF Service Co.'s motion to dismiss the entire Complaint without prejudice as to "all Defendants" on the ground that the Employees lacked standing to pursue its claims because PBGC "has the sole power to bring a lawsuit against the Defendants to recover trust assets."

It also analyzed claims one through five (the ERISA-based claims) separately. The Employees' first claim alleged that the Fiduciary Defendants breached their fiduciary duties by (a) failing to provide adequate information to enable Towers Perrin to formulate reasonable assumptions for its actuarial valuation; (b) failing to supervise, monitor, and investigate the basis for Towers Perrin's actuarial valuation; and (c) failing to make certain that sufficient assets were transferred to satisfy the accumulated benefit obligation purportedly transferred to the CFC Plan. The district court dismissed the Employees' first claim "with prejudice as to all Defendants" based on its factual findings that there was no breach of fiduciary duty because, consistent with ERISA § 208, 29 U.S.C. § 1058, the CFC Plan participants received a benefit after the spinoff that was equal to or greater than the benefit they would have received immediately before the spinoff, and the CFC Plan "remained properly funded for the next five years until 2002."

The Employees' second claim alleged that CNF breached its fiduciary duty to all CNF Plan participants "by purporting to transfer to the CFC Plan the CNF Plan's obligations to Plaintiffs and Class members when CNF knew that the CFC Plan was unlikely to be able to fulfill those obligations due to . . . inadequate funding at its inception and inability of its

sponsor, CFC, to survive as an independent corporation . . . ." The district court dismissed the second claim with prejudice as to CNF because the spinoff was a business decision not undertaken by CNF in a fiduciary capacity. It also concluded that "no Defendant violated § 208 of ERISA."

The Employees' third claim for relief alleged that the Fiduciary Defendants breached their fiduciary duties to the CFC Plan and its participants for the same reasons as alleged in the Employees' first claim for relief, except that the third claim related to post-spinoff annual valuations. The district court dismissed the third claim as to CNF and CNF Service Co. with prejudice, concluding that neither was a fiduciary of the CFC plan.[10]

The Employees' fourth claim for relief alleged that the Fiduciary Defendants breached their fiduciary duties by "(a) failing to establish a funding policy as required by the terms of the CFC Plan, (b) failing to establish a funding policy that was reasonable, including requiring that reasonable actuarial assumptions be used to value the CFC Plan, [and] (c) failing to follow a reasonable funding policy . . . ." The district court dismissed this claim with prejudice as to CNF and CNF Service Co. on the grounds that: (1) neither had a fiduciary duty to the CFC Plan to follow a funding policy, and (2) even if such a duty existed, the court's factual finding regarding compliance with 29 U.S.C. § 1058 justified dismissal.[11]

The Employees' fifth claim alleged that the Fiduciary Defendants breached their fiduciary duties at the time of the spinoff by failing to properly notify CNF Plan participants that their rights under the CNF Plan had been terminated and assumed by a new plan. The district court dismissed this

---

[10]The district court expressly made no determination with respect to this claim as alleged against the Committee Defendants.

[11]As with the third claim, the district court made no determination with respect to this claim as alleged against the Committee Defendants.

claim with prejudice "as to all Defendants" on the grounds that: (1) the Employees failed to name a defendant that had notification responsibilities; (2) the court's factual finding regarding compliance with 29 U.S.C. § 1058 resulted in no cognizable injury; and (3) alternatively, the claim was barred by the statute of limitations at ERISA § 413, 29 U.S.C. § 1113.

The Employees' sixth and seventh claims for relief alleged that Towers Perrin, acting as an actuary to the CNF Plan, committed professional negligence in (1) valuing the CFC Plan at the time of spinoff (sixth claim); and (2) in valuing the CFC Plan in subsequent annual valuations after the spinoff (seventh claim). The district court dismissed these claims with prejudice, finding that the Employees were not Towers Perrin's clients and holding that Towers Perrin, as an actuary to the plan, owed no duty to the Employees under California law, relying on *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992).

**2.**

The Employees filed a First Amended Complaint that re-alleged the third and fourth claims for relief under ERISA against the Committee Defendants, and added the eighth and ninth claims for professional negligence against Towers Perrin under "Oregon, Washington, and Any Other Applicable State Law (Other Than California)[.]" The district court granted the motions to dismiss filed by the Committee Defendants and Towers Perrin. The district court dismissed the third and fourth claims against the Committee Defendants without prejudice, concluding that the Employees had not stated a claim for relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), because they sought relief on behalf of themselves and purported class members totaling 8% of the entire plan, and not on behalf of the entire plan. The court dismissed the eighth and ninth claims without prejudice on the grounds

that the Employees failed to provide Towers Perrin with adequate notice of which state law it allegedly violated.

**3.**

The Employees filed a Second Amended Complaint, which amended the third and fourth claims to clarify the relief sought under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and added alternative allegations and relief sought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). They also amended the eighth and ninth claims to allege professional negligence against Towers Perrin under Oregon law, and added six new claims for professional negligence against Towers Perrin under the laws of Delaware, Connecticut, and Washington.

The district court dismissed nearly the entire Second Amended Complaint. It dismissed the ERISA-based claims— the amended third and fourth claims—with prejudice on the grounds that: (1) the Employees' claims under 29 U.S.C. § 1132(a)(2) still improperly sought recovery on their own behalf and not on behalf of the plan as a whole; and (2) the Employees' new claims under 29 U.S.C. § 1132(a)(3) sought money damages, which is not "appropriate equitable relief" under the statute. In a separate order, the district court applied California's choice of law rules, concluded that "the Second Amended Complaint arguably states a claim for professional negligence under Oregon law," and dismissed the Employees' claims based on Delaware law, Connecticut law, and Washington law—claims ten through fifteen—with prejudice on the grounds that those states had no interest in applying their respective laws to this case. The Employees have not appealed the dismissal of claims ten through fifteen.

**4.**

The district court ordered the Employees to file a Third Amended Complaint for the sole purpose of incorporating its prior holdings. The Employees complied with that order, and

Towers Perrin subsequently moved to dismiss the remaining state law claims. The district court granted the motion in part, holding that under California law: (1) the Oregon-resident plaintiffs stated viable professional negligence claims to which Oregon law would apply; but that (2) as a matter of law, the California-resident plaintiffs could not state claims under Oregon law because neither California nor Oregon had an interest in applying Oregon law to them and, therefore, California law as expressed in *Bily* applied. Subsequently, the district court ordered the Employees to file another amended complaint "joining Trustee PBGC as a party to the litigation" because PBGC was an indispensable party.

**5.**

The Employees' Fourth Amended Complaint added a sixteenth claim for relief against PBGC, as trustee of the terminated CFC Plan, for breach of fiduciary duty for failing to bring claims against the other named defendants on behalf of the CFC Plan. In response, the district court issued an "Order to Show Cause Why PBGC Should Not Be Dismissed from the Fourth Amended Complaint and Realigned as a Plaintiff." After a hearing, the district court dismissed the Fourth Amended Complaint with prejudice as to PBGC, holding that the breach of fiduciary duty claim was not actionable because "PBGC's determinations that (1) ERISA did not impose a requirement that PBGC file suit following the failure of the CFC Plan and (2) PBGC had no meritorious claims to assert against Towers on behalf of the plan are entitled to judicial deference."

The district court also addressed, *sua sponte*, the question of subject matter jurisdiction over the Employees' state law claims against Towers Perrin. The court dismissed the Employees' remaining state law claims against Towers Perrin, concluding that (1) the Employees lacked constitutional standing to sue because any recovery would inure to the benefit of PBGC, thus negating the Employees' redressable injury;

and (2) the Employees' claims under Oregon law were pre-empted because their "attempt to recover directly from Towers squarely conflicts with the ERISA requirement that any recovery for a fiduciary breach inures to the benefit of the pension plan rather than the individual participants."

The district court entered a Final Judgment dismissing the entire action. The Employees filed this timely appeal.

## II.

We review "de novo the district court's decision to grant a motion to dismiss for failure to state a claim, as well as its interpretation of ERISA." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 929 (9th Cir. 2006). "Under the notice pleading standard of the Federal Rules, plaintiffs are only required to give a 'short and plain statement' of their claims in the complaint." *Diaz v. Int'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citing Fed. R. Civ. P. 8(a)). In assessing motions to dismiss, we accept "all allegations of material fact in the complaint as true and construe them in the light most favorable to the non-moving party." *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of the U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). We are not, however, required to accept as true conclusory allegations that are contradicted by documents referred to in the complaint, and we do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations. *Id.*

We review de novo whether a party has standing. *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 n.3 (9th Cir. 2008).

The question of whether a duty of due care exists under California negligence law is a question of law that we review de novo. *See Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1196-97 (9th Cir. 2001); *Weiner v. Southcoast Childcare Ctrs., Inc.*, 88 P.3d 517, 522 (Cal. 2004). Further, we review de novo questions of choice of law, *Huynh v. Chase Manhat-*

*tan Bank*, 465 F.3d 992, 996 (9th Cir. 2006), and whether ERISA preempts state law claims. *See Cedars-Sinai Med. Ctr.*, 497 F.3d at 975.

## III.

The Employees' claims for relief relevant to this appeal fall into three general categories: (1) claims brought pursuant to ERISA against the Fiduciary Defendants alleging breaches of ERISA-imposed fiduciary duties (claims one through five); (2) state law professional negligence claims against Towers Perrin (claims six through nine); and (3) a claim for breach of fiduciary duty under ERISA against PBGC (claim sixteen). We address these claims in turn.

## A.

Whether the Employees may pursue their ERISA-based claims against the Fiduciary Defendants turns on issues of standing. There are two aspects of standing that are relevant here. First, the Employees must satisfy the minimum requirements of constitutional standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and footnotes omitted).

**[1]** Second, the Employees must satisfy a standing requirement imposed by ERISA. "ERISA provides for a federal cause of action for civil claims aimed at enforcing the provisions of an ERISA plan." *Reynolds Metals Co. v. Ellis*, 202 F.3d 1246, 1247 (9th Cir. 2000) (citing 29 U.S.C. § 1132(e)(1)). To state such a claim, "a plaintiff must fall within one of ERISA's nine specific civil enforcement provisions, each of which details who may bring suit and what remedies are available." *Id.* (citing 29 U.S.C. §§ 1132(a)(1)-(9)). As discussed below, the Employees have invoked the civil enforcement provisions stated in 29 U.S.C. §§ 1132(a)(2) and (a)(3).

**1.**

**[2]** The Employees allege that their claims for breach of ERISA fiduciary duties numbered one through five seek, in part, relief pursuant to 29 U.S.C. § 1132(a)(2). Section 1132(a)(2) authorizes a participant or beneficiary to bring a civil action for appropriate relief under 29 U.S.C. § 1109, which in turn authorizes a claim for breach of fiduciary duties by an ERISA fiduciary.**¹²** The Employees' claims one through five seek monetary relief for alleged breaches of fiduciary duties related to the spinoff and post-spinoff breaches.

Although the parties argue over whether the Employees have sought a proper form of relief under section 1132(a)(2), which goes to statutory standing under ERISA, we do not

---

**¹²**Relevant to this appeal, 29 U.S.C. § 1109(a) states:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

reach that issue because we hold that the Employees have not satisfied the requirements of constitutional standing. Specifically, we conclude that the Employees cannot demonstrate that it is "likely," as opposed to merely "speculative," that any injury to the CFC Plan participants will be "redressed by a favorable decision" on their section 1132(a)(2) claims. *See Lujan*, 504 U.S. at 560.

[3] We reason as follows. The Supreme Court has held that recovery for a violation of 29 U.S.C. § 1109 for breach of fiduciary duty inures to the benefit of the plan as a whole, and not to an individual beneficiary. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140-42 (1985); *see also Horan v. Kaiser Steel Ret. Plan*, 947 F.2d 1412, 1418 (9th Cir. 1991) ("Any recovery for a violation of section 1109 and 1132(a)(2) must be on behalf of the plan as a whole, rather than inuring to individual beneficiaries."). Therefore, if the Employees were to recover "make-whole" monetary relief, that recovery would inure to the benefit of the CFC Plan.**¹³** Here, however, the CFC Plan was distress terminated and is now under PBGC's control. Accordingly, any possible recovery on behalf of the CFC Plan must go to PBGC because the CFC Plan does not exist post-termination, or only exists as one of many terminated plans pooled under the auspices of PBGC and funded through PBGC's collective funds. Due to the distress termination, PBGC pays reduced benefits to plan participants under the complex priority scheme stated in ERISA § 4044(a), 29 U.S.C. §1344(a), and the amount of funds available for distribution is determined as of the date of termination. *See* 29 C.F.R. §§ 4044.3(b), 4044.41(b). ERISA § 4044(c) also mandates that a post-termination increase or

---

**¹³**The Employees have sought at least some relief on behalf of the entire CFC Plan under 29 U.S.C. § 1109(a), and thus come within the enforcement provision in 29 U.S.C. § 1132(a)(2). In connection with claims one, three, and four, the Employees requested that the district court "order that the Fiduciary Defendants, and each of them, make good to the CFC Plan all losses to the CFC Plan resulting from [their] breaches."

decrease in the CFC Plan's assets be credited or suffered by PBGC. 29 U.S.C. § 1344(c) ("Any increase or decrease in the value of the assets of a single-employer plan occurring after the date on which the plan is terminated shall be credited to, or suffered by, the corporation."). Because the Employees' post-termination recovery would be paid to PBGC, and PBGC is under no obligation to pay any of the Employees any money above the statutory minimum, the Employees have no stake in the recovery and cannot satisfy the redressability requirement of constitutional standing.

Our reasoning is consistent with our decision in *Glanton ex. rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123 (9th Cir. 2006), *cert. denied*, 128 U.S. 126 (2007). The plaintiffs in *Glanton* were prescription drug plan participants who sued a benefits management company pursuant to ERISA § 502(a)(2), alleging that it breached its ERISA fiduciary duties by secretly keeping the "spread" between what it charged the plan for drugs and what it paid to drug suppliers. Plaintiffs claimed that if their lawsuit were to succeed, the plan's drug costs would decrease and contributions and co-payments might also decrease. In *Glanton*, we held that although plaintiffs suffered a cognizable injury, it was not redressable because nothing would force the plan sponsors to reduce drug prices, contributions, or co-payments. 465 F.3d at 1125-27. We recognized that "ERISA plan beneficiaries may bring suits on behalf of the plan in a representative capacity," but that there "is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or predict.' " *Id.* at 1125 (citations omitted). The Employees are analogous to the plaintiffs in *Glanton* because any recovery, which is payable to PBGC, would not necessarily compel PBGC to increase the benefits paid to the Employees, and we cannot presume to compel such payments.

**[4]** Our approach recognizes PBGC's role as an insurer of guaranteed and non-guaranteed benefits. Upon distress termi-

nation, employers are liable to PBGC for any unfunded benefit liabilities. 29 U.S.C. § 1362(b)(1)(A); *United Steelworkers of Am., AFL-CIO, CLC v. United Eng'g, Inc.*, 52 F.3d 1386, 1391 (6th Cir. 1995). After recovery from the employer, PBGC must pay plan participants all guaranteed benefits and a portion of non-guaranteed benefits based on a statutory formula. *See* 29 U.S.C. §§ 1322, 1344; *United Steelworkers*, 52 F.3d at 1391. In a way, then, there is a trade-off in which PBGC is permitted to receive the excess of non-guaranteed benefits collected from an employer in return for guaranteeing certain benefits to the plan participant. Despite the fact that PBGC *could* pass along such an additional recovery to the Employees, the ERISA statute does not *compel* PBGC to do so, and we have no mechanism to compel PBGC to pass along the recovery. Therefore, the independent actor barrier to standing applies and the Employees have not demonstrated that it is "likely," and not merely "speculative," that their injury will be redressed by a favorable decision in the district court.

We pause to consider the Fourth Circuit's decision in *Wilmington Shipping Co. v. New England Life Insurance Co.*, 496 F.3d 326 (4th Cir. 2007). There, a plan participant in a terminated plan sued the plan sponsor under 29 U.S.C. § 1132(a)(2) for breach of fiduciary duty seeking recovery of losses to the plan as a result of the breach. Addressing the issue of constitutional standing, and specifically redressability, the Fourth Circuit held that the plan participant had standing to sue on behalf of the plan, notwithstanding that PBGC served as trustee and that the recovered funds would go into PBGC's pooled coffers. *Id.* at 335-36. It reasoned that PBGC occupies two roles: (1) guarantor of unpaid, guaranteed benefits; and (2) statutory trustee if appointed under ERISA. *See id.* at 331-33. The court stated:

> PBGC, acting as trustee, must hold plan assets in trust for the benefit of plan participants and pay *all* plan benefits, if possible, in accordance with the stat-

utory order of priorities. *See* 29 U.S.C.A. §§ 1342(d)(1)(A)(ii), 1344. Only *after* the PBGC as trustee has allocated plan assets and determined that the plan has insufficient funds to meet its obligations does the PBGC *as guarantor* "chip in" from ERISA funds to cover the unpaid guaranteed benefits.

*Id.* at 336.[14]

**[5]** Under this rationale, PBGC, as trustee, would be obligated to pay non-guaranteed CFC Plan benefits, if possible, out of the plan assets and any potential recovery in this lawsuit. Not until those assets ran out would PBGC assume its role as guarantor. However, the authorities cited by the Fourth Circuit—29 U.S.C. §§ 1342(d)(1)(A)(ii) and 1344—do not compel or direct such a payment. Moreover, *Wilmington Shipping's* requirement that PBGC pay all non-guaranteed benefits to plan participants in a distress terminated plan would contradict the superior power to pool and disperse assets given to PBGC in 29 U.S.C. § 1342(a):

> Notwithstanding any other provision of this subchapter, the corporation is authorized to pool assets of terminated plans for purposes of administration, investment, payment of liabilities of all such terminated plans, and such other purposes as it determines to be appropriate in the administration of this subchapter.

We decline to adopt the rule from *Wilmington Shipping* and hold that PBGC's role as an independent actor negates redressability, and thus the Employees' Article III standing to bring claims pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

---

[14]We also note that PBGC may actually restore a plan after termination, but this decision is within PBGC's discretion. 29 U.S.C. § 1347.

**2.**

We next address those portions of the Employees' claims two through five that allege ERISA-based claims for breach of fiduciary duties for which the Employees seek relief under 29 U.S.C. § 1132(a)(3). We hold that assuming the Employees have Article III standing to pursue these claims, they nonetheless lack statutory standing to bring these claims under section 1132(a)(3) because they do not seek "appropriate equitable relief" within the meaning of that section.

**[6]** Relevant to this appeal, section 502(a)(3)(B) of ERISA permits a participant or beneficiary to bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B). Thus, the complaining party must seek "equitable, rather than legal, relief." *Reynolds Metals Co.*, 202 F.3d at 1247. In assessing whether a claim for "equitable" relief has been properly brought under ERISA, we look to the "substance of the remedy sought . . . rather than the label placed on that remedy." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1185 (9th Cir. 2004) (citation and internal quotation marks omitted). Further, "[t]o establish an action for equitable relief under . . . 29 U.S.C. § 1132(a)(3), the defendant must be an ERISA fiduciary acting in its fiduciary capacity and must violate ERISA-imposed fiduciary obligations." *Id.* at 1178 (citations and internal quotation marks omitted). Unlike 29 U.S.C. § 1132(a)(2), which requires that relief sought must be on behalf of the entire plan, the Supreme Court has held that a participant or beneficiary has standing pursuant to section 1132(a)(3) to seek individual recovery in the form of "appropriate equitable relief." *See Varity Corp. v. Howe*, 516 U.S. 489, 509-10 (1996).

The Employees' complaint requests several forms of relief in connection with claims two through five. The Employees' opening brief on appeal, however, asserts that only the fol-

lowing forms of relief are "equitable," and thus properly sought under section 1132(a)(3): (1) reinstatement into the CNF Plan based on the second claim, alleged only against CNF; and (2) an order on the third and fourth claims that "the Fiduciary Defendants . . . make good to the CFC Plan all losses to the CFC Plan" resulting from breaches of fiduciary duties, *i.e.*, "make-whole monetary relief." Accordingly, we address only these forms of purported equitable relief.[15] *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief.").

[7] The Employees' second claim for relief, which seeks, in part, reinstatement into the CNF Plan, does not seek relief provided in 29 U.S.C. § 1132(a)(3) because the relief sought is not related to a breach of a fiduciary duty by CNF. Reinstatement into a plan has been recognized as appropriate equitable relief under section 1132(a)(3). *See generally Varity Corp.*, 516 U.S. 489 (holding that section 1132(a)(3) supports a cause of action for individual beneficiaries who allege that a plan fiduciary made material misrepresentations about their benefits.); *Mathews*, 362 F.3d at 1186 (holding that "instatement" into a plan is an equitable remedy where it would return the plaintiffs to the position they would have occupied absent a plan fiduciary's misrepresentation that induced them to opt out of an enhanced benefit scheme); *Reynolds Metals Co.*, 202 F.3d at 1249 (recognizing reinstatement as traditionally equitable relief). However, in order to be eligible for reinstatement into the CNF Plan, which would return the Employees to the position they occupied before the spinoff, the Employees would have to establish that CNF breached a fiduciary duty in *deciding* to conduct the plan spinoff. The Employees cannot do this as they acknowledge that a decision to spin a plan off, as opposed to implementing the spinoff, is

---

[15]The Employees' complaint also seeks relief under section 1132(a)(3) for their fifth claim related to ERISA notification rights, but the Employees have abandoned this claim by not arguing its merits on appeal.

not a fiduciary act. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890-91 (1996) (holding that when plan administrators adopt, modify, or terminate pension benefit plans, they are not acting as fiduciaries); *Systems Council EM-3 v. AT&T Corp.*, 159 F.3d 1376, 1380 (D.C. Cir. 1998) (holding that decision to spin off division of company was not a fiduciary act); *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1342 (9th Cir. 1994) (stating that the decision to terminate a plan, as opposed to implementing that decision, is not a fiduciary act). Therefore, the spinoff decision does not give rise to a breach of fiduciary duty that supports reinstatement into the CNF Plan.

[8] We also conclude that the Employees' third and fourth claims, which seek "make-whole monetary relief" under 29 U.S.C. § 1132(a)(3), are foreclosed by Supreme Court precedent. The Court has held that the term "equitable relief" in section 1132(a)(3) "must refer to 'those categories of relief that were *typically* available in equity . . . .' " *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)). In *Mertens*, the Court held that plaintiffs who sued their pension plan's actuary for breach of its fiduciary duties could not seek relief pursuant to section 1132(a)(3) because their claims sought "monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties," which is the "classic form of *legal* relief." 508 U.S. at 255 (stating that "[a]lthough they often dance around the word, what petitioners in fact seek is nothing more than compensatory *damages*"). Similarly, here, the Employees request that the Fiduciary Defendants make them "whole in the amounts by which their pension benefits have been reduced as a result of these breaches." As in *Mertens*, the Employees' claim for "make-whole monetary relief" seeks money damages, which fall outside of the remedy provisions of 29 U.S.C. § 1132(a)(3).[16]

---

[16]Although the Supreme Court's grant of certiorari in *LaRue v. DeWolff, Boberg & Associates, Inc.* encompassed the question of whether "make-whole relief" sought in relation to a defined contribution plan is "equitable" within the meaning of 29 U.S.C. § 1132(a)(3), the Court's opinion did not address the merits of that question. *See* 128 S. Ct. 1020, 1023 (2008).

\* \* \*

**[9]** We conclude that the district court correctly dismissed the Employees' ERISA-based claims. The Employees have not satisfied the requirements for Article III standing with respect to their claims brought pursuant to 29 U.S.C. § 1132(a)(2). Further, the Employees do not seek appropriate equitable relief for fiduciary breaches within the meaning of 29 U.S.C. § 1132(a)(3).

**B.**

We next evaluate whether the Employees have stated a cognizable claim for professional negligence against Towers Perrin based on Towers Perrin's valuation work at the time of the spinoff and in subsequent years. The Employees' sixth and seventh claims allege that Towers Perrin owed them a duty of ordinary care under California law, and that Towers Perrin breached that duty.

**1.**

Under California law, "[t]he threshold element of a cause of action for negligence is the existence of a duty to use due care toward the interest of another that enjoys legal protection against unintentional invasion." *Bily*, 834 P.2d at 760-61. Whether a duty of ordinary care exists is a question of law. *Glenn K. Jackson Inc.*, 273 F.3d at 1196-97.

**[10]** California law sharply limits the duty of ordinary care imposed on a supplier of information to non-clients. In *Bily*, the California Supreme Court considered "whether and to what extent an accountant's duty of care in the preparation of an independent audit of a client's financial statements extends to persons other than the client." 834 P.2d at 746. The court held that "an auditor owes no general duty of care regarding the conduct of an audit to persons other than the client."**17** *Id.*

---

**17**The *Bily* court did hold, however, that an auditor may be held liable for negligent misrepresentations in an audit report to those persons who

at 746; *see id.* at 768 ("[W]e hold that an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory."). In declining "to permit all merely foreseeable third party users of audit reports to sue the auditor on a theory of professional negligence," the *Bily* court premised its holding on three central policy concerns:

> (1) Given the secondary "watchdog" role of the auditor, the complexity of the professional opinions rendered in audit reports, and the difficult and potentially tenuous causal relationships between audit reports and economic losses from investment and credit decisions, the auditor exposed to negligence claims from all foreseeable third parties faces potential liability far out of proportion to its fault; (2) the generally more sophisticated class of plaintiffs in auditor liability cases . . . permits the effective use of contract rather than tort liability to control and adjust the relevant risks through "private ordering"; and (3) the asserted advantages of more accurate auditing and more efficient loss spreading relied upon by those who advocate a pure foreseeability approach are unlikely to occur; indeed, dislocations of resources, including increased expense and decreased availability of auditing services in some sectors of the economy, are more probable consequences of expanded liability.

*Id.* at 761.

---

act in reliance on those misrepresentations. *See* 834 P.2d at 746, 768-73. This holding from *Bily* is not at issue here because the Employees have not alleged that Towers Perrin is liable for negligent misrepresentation.

**[11]** We noted in *Glenn K. Jackson Inc.* that "California and federal courts have applied the *Bily* rationale to other suppliers and evaluators of information." 273 F.3d at 1199 (holding that accounting firm hired by client to audit law firm's bills to client owed no duty to the law firm).[18] We have concluded that the limitations imposed by *Bily* "apply widely to those who supply or evaluate information to limit their liability to even foreseeable third parties who have an interest in their work product." *Id.* at 1199.

We hold that Towers Perrin does not owe a general duty to the non-client Employees in the context of this case because two of the policy concerns at issue in *Bily* weigh against imposing a duty of ordinary care. First, imposing such a duty could lead to potential liability for an actuary that is far out of proportion with its fault. The actuarial work performed at the time of a spinoff and afterward involves the derivation of funding conclusions based on assumptions about the expected retirement age of plan participants and projected rates of return for plan funding. As was the case with the auditors in *Bily*, the work of an actuary at issue here involves a "professional opinion based on numerous and complex factors" and cannot be "checked against uniform standards of indisputable accuracy." 843 P.2d at 763 (stating that "an audit report is not

[18]*See also Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 532-33 (Cal. 1998) (holding that title insurer owed no duty of ordinary care to non-clients, commenting that "[i]n the business arena it would be unprecedented to impose a duty on one actor to operate its business in a manner that would ensure the financial success of transactions between third parties"); *Cabanas v. Gloodt Assoc.*, 942 F. Supp. 1295, 1308-10 (E.D.Cal. 1996) (holding that appraiser owed no duty of ordinary care to third party related to investigation, drafting, and distribution of appraisal), *affirmed at* 141 F.3d 1174 (9th Cir. Mar. 3, 1998) (unpublished); *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 84 Cal. Rptr. 2d 799, 801-03 (Ct. App. 1999) (holding that insurer-retained claims adjuster owed no duty to insured); *cf. Soderberg v. McKinney*, 52 Cal. Rptr. 2d 635, 640 (Ct. App. 1996) (stating, in the context of negligent misrepresentation claim, that "[w]hile *Bily* involved the liability of accountants (or auditors), we see no reason why its discussion should be limited to that group of professionals").

a simple statement of verifiable fact . . . , like the weight of the load of beans").

Second, the probability of increased expense and decreased availability of actuarial services outweighs the possible advantages of imposing a negligence duty on an actuary in connection with a spinoff, such as more accurate valuations and more efficient loss spreading. *See id.* at 765-66. The imposition of a duty of ordinary care—with resulting potential liability exposure in the hundreds of millions of dollars—would have the probable effect of decreasing the availability of actuarial services; increasing the cost of actuarial services generally; increasing clients' indemnification obligations to retained actuaries; and increasing insurance costs for both actuaries and clients. These factors weigh against the probability that increased liability exposure would increase the accuracy of actuarial services, especially when such services do not involve precise, verifiable science.

**[12]** For these reasons, we decline to impose a duty of ordinary care on actuaries in connection with spinoff-related valuation work absent a California statute or supporting case law. Finding such a duty as a general matter would be inconsistent with the decisions of the California Supreme Court interpreting California law.

**[13]** However, our inquiry into whether Towers Perrin owed a duty of ordinary care to the Employees does not end here. Despite the *Bily* court's holding that an auditor's liability for general negligence is confined to the client, it recognized the possibility that intended third party beneficiaries could recover for an auditor's professional negligence:

> In theory, there is an additional class of persons who may be the practical and legal equivalent of "clients." It is possible the audit engagement contract might expressly identify a particular third party or parties so as to make them express third party bene-

ficiaries of the contract. Third party beneficiaries may under appropriate circumstances possess the rights of parties to the contract.

*Id.* at 767 & n.16 (citations omitted); *see also Glenn K. Jackson Inc.*, 273 F.3d at 1199-1200 (recognizing the third party beneficiary "exception" to the *Bily* rule); *Mariani v. Price Waterhouse*, 82 Cal. Rptr. 2d 671, 677 (Ct. App. 1999) (same). The *Bily* court stated that it was not presented with a third party beneficiary issue because "[n]o third party is identified in the engagement contract." *Bily*, 834 P.2d at 767 n.16. Although *Bily* might be read to require that a third party beneficiary's name appear in the engagement agreement in order to give rise to a duty, *id.*, California decisions pre-dating *Bily* indicate that "[i]t is not necessary that an express beneficiary be specifically identified in the relevant contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created." *Outdoor Servs., Inc. v. Pabagold, Inc.*, 230 Cal. Rptr. 73, 76 (Ct. App. 1986); *see also Mariani*, 82 Cal. Rptr. 2d at 679 (noting that despite *Bily's* use of the term "express" third party beneficiaries, "it does not appear *Bily* meant to create a new category of specifically designated beneficiaries, whether for tort or breach of contract purposes").

We reverse the district court's dismissal of claims six and seven based on the intended third party beneficiary exception to the general rule announced in *Bily*. The Employees have alleged that Towers Perrin "provided actuarial services to the CNF Plan and the CFC Plan for the benefit of Plan participants, including Plaintiffs, from at least November 1996 forward . . . ." They have also alleged that they were "intended beneficiaries of the professional services rendered" by Towers Perrin. Towers Perrin filed its motion to dismiss before the parties conducted discovery, and Towers Perrin's engagement agreement is not in the record. In the present procedural posture, we take the Employees' allegations as true. *Cedars-Sinai Med. Ctr.*, 497 F.3d at 975. Given *Bily's* recognition that

intended third party beneficiaries might be able to recover from an auditor, combined with the Employees' allegations regarding the benefits Towers Perrin purportedly intended to provide to the plan beneficiaries at the time of the spinoff and post-spinoff, we conclude that the Employees' sixth and seventh claims potentially state a claim upon which relief might be granted.[19] The Employees might be unable to ultimately prevail on a third party beneficiary theory, but we cannot conclude that they have not brought themselves within the third party beneficiary exception insofar as a motion to dismiss is concerned.

[14] We hold that Towers Perrin does not generally owe a duty of ordinary care to the Employees, who are not Towers Perrin's clients. However, we hold that Towers Perrin may owe a duty to the Employees if they can be considered intended third party beneficiaries of Towers Perrin's service agreement. Because the record on appeal is insufficient to allow us to evaluate whether the Employees are indeed intended third party beneficiaries, we remand this question to the district court so that it may make the determination on a more complete factual record.

**2.**

Because we disagree with the Employees' broad reading of Towers Perrin's tort duties under California law, we must also

---

[19]Towers Perrin argues that the Employees' claims fail in part because "there are no allegations here to demonstrate that any agreement between Towers Perrin and the pension plan was expressly intended to benefit Plaintiffs." This argument is unpersuasive given the procedural posture of this case. No evidence in the record suggests that the Employees had access to the Towers Perrin engagement agreement or related documents, and it is the very purpose of discovery to establish the contents of that agreement. Moreover, as noted, if the context of the agreement clearly reveals that the participants were intended third party beneficiaries, the fact that they are not specifically mentioned in the agreement might not be dispositive.

consider the Employees' eighth and ninth claims for relief, which allege that Towers Perrin also breached its duty of ordinary care under Oregon law. We need not address the merits of these claims because, applying California's choice of law principles, we hold that California law applies to the Employees' negligence claims against Towers Perrin.

In a federal question action that involves supplemental jurisdiction over state law claims, we apply the choice of law rules of the forum state—here, California. *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."); *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000) ("[A] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction.").

Under California's choice of law rules, California will apply its own rule of decision unless a party invokes the law of a foreign state that "will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Hurtado v. Superior Court*, 522 P.2d 666, 670 (Cal. 1974). California courts employ a "governmental interest analysis" to assess whether California law or non-forum law should apply:

> To determine the correct choice of law, we apply a three-step analysis. First, we determine whether the two concerned states have different laws. Second, we consider whether each state has an interest in having its law applied to this case. Finally, if the laws are different and each state has an interest in having its own law applied, we apply the law of the state whose interests would be more impaired if its policy were subordinated to the policy of the other state.

*Havlicek v. Coast-to-Coast Analytical Servs.*, 46 Cal. Rptr. 2d 696, 699 (Ct. App. 1995) (citations and internal quotations omitted).

Here, the choice of law inquiry ends at step one of the governmental interest analysis because California law and Oregon law do not differ. As stated above, California law generally states that the duty of ordinary care owed by a supplier of information (*e.g.*, accountant, auditor, etc.) does not run to non-clients. *See Bily*, 834 P.2d at 767. However, California law recognizes an exception to the general rule, that such a supplier of information does owe a duty to intended third party beneficiaries. *See id.* at 767 n.16.

Similarly, under Oregon law, "a negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896 (Or. 1992) (footnote omitted). The Oregon Supreme Court has held, however, that in a negligence action to recover economic losses, "nongratuitous suppliers of information owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." *Id.* at 899.

**[15]** Based on the foregoing, we conclude that there is no conflict between California law and Oregon law regarding an information supplier's duty to third-party, non-client users of information. Both states' laws dictate that, as a general matter, an ordinary negligence duty does not run from a provider of information to a non-client. Both states' laws, however, make an exception for intended third-party beneficiaries. Because the Employees have not demonstrated a conflict between the states' respective laws, we hold that the law of the forum—California law—applies to the Employees' negligence claims against Towers Perrin. Accordingly, we affirm the district

court's dismissal of the Employees' eighth and ninth claims for relief.

### 3.

We next consider Towers Perrin's assertion that even if California law provides for a claim by intended third party beneficiaries, it is preempted by ERISA. There are two strands of ERISA preemption: (1) "express" preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a "conflict" with ERISA's exclusive remedial scheme set forth in 29 U.S.C. § 1132(a), notwithstanding the lack of express preemption. *Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir. 2005). We address both types of preemption and conclude that ERISA does not preempt the Employees' state law claims.

### a.

[16] ERISA's preemption provision, 29 U.S.C. § 1144(a), expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." *See also Cleghorn*, 408 F.3d at 1225. The Supreme Court has criticized the "unhelpful text" of this ERISA preemption provision, *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997) ("*Dillingham*"), and we have similarly remarked that the "relate to" language has been the source of great confusion and multiple and slightly differing analyses. *Abraham v. Norcal Waste Sys., Inc.*, 265 F.3d 811, 819 (9th Cir. 2001), *cert denied*, 535 U.S. 1015 (2002) *and* 537 U.S. 1071 (2002).[20] In any event, the Supreme Court has instructed that a law relates

---

[20]Although the phrase "relate to" has been construed broadly, the Court has narrowed the applicability of 29 U.S.C. § 1144(a) in more recent years. *Abraham*, 265 F.3d at 820 (citing *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) ("*Travelers*")).

to an employee benefit plan if it has either a "connection with" or "reference to" such a plan. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990). This is a two-part inquiry. *Dillingham*, 519 U.S. at 324.

[17] We first address the "reference to" preemption inquiry. "To determine whether a law has a forbidden 'reference to' ERISA plans, we ask whether (1) the law 'acts immediately and exclusively upon ERISA plans,' or (2) 'the existence of ERISA plans is essential to the law's operation.' " *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 546 F.3d 639, 657 (9th Cir. 2008) (quoting *Dillingham*, 519 U.S. at 325). In *Abraham v. Norcal Waste Sys., Inc.*, we held that the plaintiffs' claim of negligence based on state law was not pre-empted under the "reference to" step of the preemption analysis, explaining that "the relevant state law certainly does not act immediately and exclusively on an ERISA plan, nor is such a plan essential to the operation of the law." 265 F.3d at 820; *see also Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 724 n.4 (9th Cir. 1997) (holding that state law negligence claims were not preempted under the "refers to" prong). Our case law directs a conclusion that the Employees' state law negligence claims are not preempted under the "reference to" prong of the preemption test. The Employees' professional negligence claims are based on common law negligence principles and California Civil Code §§ 1708 and 1714(a). These laws do not act "immediately and exclusively" on ERISA plans, and the existence of an ERISA plan is not essential to these laws' operation.

Turning to preemption under the "connection with" language, we note that the Supreme Court has not provided a succinct definition of, or analytical framework for, evaluating the phrase "connection with." *See Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1216 (9th Cir. 2000), *cert. denied* 531 U.S. 992 (2000). Instead, "to determine whether a state law has the forbidden connection, we look both to the objectives of the ERISA statute as a guide to

the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (internal citations and quotation marks omitted); *see also Golden Gate Rest. Ass'n*, 546 F.3d at 654 (employing a " 'holistic analysis guided by congressional intent' " (citation omitted)). We have recognized that " '[t]he basic thrust of the pre-emption clause [is] to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans.' " *Rutledge*, 201 F.3d at 1216 (quoting *Travelers*, 514 U.S. at 657) (modification in original). We have also noted that "the Court has established a presumption that Congress did *not* intend ERISA to preempt areas of 'traditional state regulation' that are 'quite remote from the areas with which ERISA is expressly concerned — reporting, disclosure, fiduciary responsibility, and the like.' " *Id.* (quoting *Dillingham*, 519 U.S. at 330).

[18] We have employed a "relationship test" in analyzing "connection with" preemption, under which a state law claim is preempted when the claim bears on an ERISA-regulated relationship, *e.g.*, the relationship between plan and plan member, between plan and employer, between employer and employee. *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004); *see also Gen. Am. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1521 (9th Cir. 1993) ("The key to distinguishing between what ERISA preempts and what it does not lies . . . in recognizing that the statute comprehensively regulates certain *relationships*: for instance, the relationship between plan and plan member, between plan and employer, between employer and employee (to the extent an employee benefit plan is involved), and between plan and trustee."); *Abraham*, 265 F.3d at 820-21 (same); *accord Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003).

[19] Under the relationship test, the Employees' state law claims do not encroach on ERISA-regulated relationships. The duty giving rise to the negligence claim runs from a third-

party actuary, *i.e.*, a non-fiduciary service provider, to the plan participants as intended third party beneficiaries of the actuary's service contract. The Employees' claims against Towers Perrin do not interfere with relationships between the plans and a participant, between the plans and CNF or CFC, or between those companies and their employees. At most they might interfere with a relationship between the plan and its third-party service provider. But as we stated in *Castonguay*, "ERISA doesn't purport to regulate those relationships where a plan operates just like any other commercial entity—for instance, the relationship between the plan and its own employees, or the plan and its insurers or creditors, or the plan and the landlords from whom it leases office space." 984 F.2d at 1522.[21] Here, ERISA does not regulate the relationship at issue and, therefore, there is no express preemption under the "connection with" prong. Moreover, there is no indication that the negligence would result in a multiplicity of regulation, Congress's chief concern in enacting the ERISA preemption statute.

**[20]** Towers Perrin's reliance on *United Steelworkers of America, AFL-CIO, CLC v. United Engineering, Inc.*, 52 F.3d 1386, is unpersuasive. In *United Steelworkers*, the Sixth Circuit held that plan participants in a distress-terminated plan where PBGC was the designated trustee could not bring a direct claim against the plan sponsor under the Labor Management Relations Act to recover non-guaranteed pension benefits because that claim was preempted by ERISA. First, *United Steelworkers* is inapposite because it involved displacement of federal common law, which is analyzed under a different framework than the question of preemption of state

---

[21]*See also Ariz. State Carpenters*, 125 F.3d. at 724 (state law negligence claim against bank not preempted); *Gerosa*, 329 F.3d at 328-30 (state law professional malpractice claim against actuary not preempted); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1470-71 (4th Cir.1996) (state law professional malpractice claim against insurance professionals not preempted because, in part, it is rooted in a field of traditional state regulation).

law claims under 29 U.S.C. § 1144(a). *See id.* at 1393. Second, as the district court noted here, *United Steelworkers* is distinguishable because the plaintiffs there brought their claims against the plan sponsor, not a third-party service provider. Although a state law negligence claim such as this one might encroach on an ERISA-regulated relationship were it made against a plan sponsor, it does not encroach on any actuary-participant relationship governed by ERISA when asserted against a non-fiduciary actuary.

**b.**

Having determined that the Employees' state law negligence claims are not expressly preempted under ERISA, we next address Towers Perrin's argument that the Employees' negligence claims are "conflict preempted" by ERISA's exclusive civil enforcement scheme.

"ERISA section 502(a) contains a comprehensive scheme of civil remedies to enforce ERISA's provisions." *Cleghorn*, 408 F.3d at 1225. "A state cause of action that would fall within the scope of this scheme of remedies is preempted as conflicting with the intended exclusivity of the ERISA remedial scheme, even if those causes of action would not necessarily be preempted by section 514(a)." *Id.* (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 n.4 (2004)). In *Ingersoll-Rand Co.*, the Supreme Court held that a plan participant's state law claim for wrongful discharge was conflict preempted because that claim fell "squarely within the ambit of ERISA § 510" and ERISA § 502(a) provided a remedy for violations of section 510. 498 U.S. at 142-45 ("Unquestionably, the Texas cause of action purports to provide a remedy for the violation of a right expressly guaranteed by § 510 and exclusively enforced by § 502(a)."). The Court also noted that "it is no answer to a pre-emption argument that a particular plaintiff is not seeking recovery of pension benefits." *Id.* at 145.

As discussed above, ERISA's civil enforcement provision outlines a participant's possible claims, which include "(1) an action to recover benefits due under the plan, ERISA § 502(a)(1)(B); (2) an action for breach of fiduciary duties, ERISA § 502(a)(2); and (3) a suit to enjoin violations of ERISA or the Plan, or to obtain other equitable relief." *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1008 (9th Cir. 1998). Here, the Employees sued Towers Perrin under state law for damages as a result of its professional negligence in valuing the benefit liabilities of the prospective CFC Plan; certifying that the CFC Plan would deliver benefits to the CFC Plan participants equal to or greater than were due under the CNF Plan as is required by ERISA § 208, 29 U.S.C. § 1058; and annually certifying adequate funding of the CFC Plan. It is true that ERISA's adequate funding requirement provides the standard by which Towers Perrin's valuation and certifications would be judged with respect to the state law negligence claims. However, the Employees' negligence claim against Towers Perrin does not seek damages based on a breach of fiduciary duty and does not seek to enjoin Towers Perrin in any way. One could, however, analogize the Employees' claim as one "to recover benefits due . . . under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). If so, then the claim would likely be conflict preempted because ERISA would provide both a cause of action and an enforcement remedy. However, the Employees are not suing for benefits based on plan language—they are suing for state law negligence damages.[22]

Towers Perrin argues that the Employees' claims would interfere with the statutory scheme in Title IV of ERISA,

---

[22]The district court concluded that the Employees' claims were preempted because they conflicted with ERISA § 409(a), 29 U.S.C. § 1109(a), which does not permit individual plan participants to sue for *breach of fiduciary duty* unless the benefit inures to the entire plan. This conclusion is erroneous because the Employees did not sue Towers Perrin based on a breach of fiduciary duty under 29 U.S.C. § 1109(a); they never alleged that Towers Perrin was an ERISA fiduciary.

which governs PBGC's payment of reduced benefits to plan participants of plans that have been distress terminated. *See* 29 U.S.C. § 1344(a). As the Fiduciary Defendants argued with respect to Article III standing on the Employees' ERISA-based claims, Towers Perrin argues that recovery from Towers Perrin on state law negligence claims would result in an increase in the value of plan assets under section 4044(c) and would alter, and thus interfere with, the prioritized payment scheme under section 4044(a).

**[21]** This argument is unpersuasive. The Employees are suing Towers Perrin for tort damages payable to the class of aggrieved plaintiffs based on a duty owed them by Towers Perrin under state law, not for damages for breach of fiduciary duty payable to the plan (and thus PBGC).[23] Moreover, in this case the class the Employees seek to represent all participants whose benefits were reduced under PBGC's trusteeship. Therefore, there is no encroachment on the section 4044(a) allocation scheme. The Employees' negligence claims are not conflict preempted, and, as discussed above, are not expressly preempted.

## C.

Finally, we address the Employees' sixteenth claim for relief, which alleges that PBGC breached its fiduciary duties under 29 U.S.C. §§ 1132(a)(2) and (a)(3) by choosing not to pursue claims against the Fiduciary Defendants or Towers

---

[23]For similar reasons, we reject Towers Perrin's argument that the Employees lack a redressable injury, and thus constitutional standing, to sue them for negligence damages. If the district court determines that Towers Perrin owes a duty to the Employees under the third party intended beneficiary rationale discussed above, that negligence claim would be based on a duty that runs from Towers Perrin directly to the CFC Plan participants. There is also no statutory mechanism through which a tort recovery by individual plaintiffs would inure to the benefit of PBGC. Therefore, the Employees would have a stake in the recovery as victims of an alleged tort and, therefore, Article III standing.

Perrin. Based on the presumption in *Heckler v. Chaney*, 470 U.S. 821 (1985), we hold that PBGC's discretionary decision not to pursue such claims is not subject to judicial review.

**[22]** In *Heckler*, the United States Supreme Court held that a government agency's discretionary decision not to pursue an enforcement action should be presumed immune from judicial review under the Administrative Procedures Act. *See* 470 U.S. at 832. The Court's decision was animated by the "general unsuitability for judicial review of agency decisions to refuse enforcement," which the Court explained:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

470 U.S. at 831-32. This jurisdictional bar applies where " 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 867 (9th Cir. 2006) (quoting *Heckler*, 470 U.S. at 830); *see also Port of Seattle, Wash. v. FERC*, 499 F.3d 1016, 1027 (9th Cir. 2007) ("[T]he concern is that courts should not intrude upon an agency's prerogative to pick and choose its priorities, and allocate its resources accordingly, by demanding that an agency prosecute or enforce."). "[T]he presumption may be rebutted where the substantive statute has

provided guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832-33.

This presumption often arises in the context of a challenge to agency action under the APA. *See*, *e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 818-19 (1992); *Serrato v. Clark*, 486 F.3d 560, 568 (9th Cir. 2007). As a result, the Employees suggests that the presumption does not apply to claims not brought under the APA. However, as we stated in *Sierra Club v. Whitman*, "[t]he presumption . . . has a long history and . . . is not limited to cases brought under the APA." 268 F.3d 898, 902 (9th Cir. 2001) (holding that a challenge to the EPA Administrator's decision not to initiate enforcement brought under 33 U.S.C. § 1365 was not subject to review, and recognizing that the *Heckler* presumption was based on the Court's review of four non-APA cases).

**[23]** Turning to the applicability of the *Heckler* presumption here, PBGC retains discretion to sue on behalf of a distress-terminated plan. When PBGC is acting as trustee to a distress terminated plan, it "has the power . . . to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan." 29 U.S.C. § 1342(d)(1)(B)(iv). Nothing in ERISA expressly compels PBGC to pursue claims on the terminated plan's behalf.

Also favoring application of the jurisdictional bar is the breadth of 29 U.S.C. § 1342(d)(1)(B)(iv)—from which PBGC derives the power to sue—and the lack of standards by which a court may review PBGC's decision not to sue on behalf of the plan. There is no "meaningful standard" against which to judge PBGC's decision not to act. *See*, *e.g.*, *Port of Seattle*, 499 F.3d at 1027.

**[24]** PBGC's unique role in the ERISA statutory scheme further justifies application of the presumption against judicial review. PBGC's decision regarding whether to sue on behalf of a plan involves the "complicated balancing" of all five fac-

tors identified in *Heckler*. PBGC must evaluate whether an ERISA violation has occurred, whether its limited resources are best spent on pursuing claims based on one violation or another, whether it is likely to succeed if it acts, whether the particular lawsuit best fits the agency's overall policies, and whether it has enough resources to undertake the action at all.[24] *See Heckler*, 470 U.S. at 831-32.

**[25]** PBGC must weigh additional considerations that are within the ambit of its peculiar expertise. PBGC has a broad set of agency purposes, not all of which conclusively favor suing each time it has an arguable claim. Its purposes are "(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans . . . , and (3) to maintain premiums established by [PBGC] . . . at the lowest level consistent with [statutory obligations]." 29 U.S.C. §§ 1302(a)(1)-(3) (alterations added). Further, PBGC derives its funding from Congressionally-authorized and plan sponsor-paid insurance premiums, investment income, pooled assets from terminated plans for which it acts as trustee, and recoveries from former sponsors of terminated plans. *See* 29 U.S.C. §§ 1305, 1342(a). Taken together, PBGC must balance its statutory duties to all stakeholders, including premium payers, participants and beneficiaries in ongoing plans, and those in all of its terminated plans.

**[26]** The preceding leads us to the conclusion that the *Heckler* presumption applies to PBGC's decision not to pursue claims on behalf of the CFC Plan, and we further conclude that no ERISA provision rebuts the presumption. As stated, PBGC "has the power . . . to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan." 29 U.S.C. § 1342(d)(1)(B)(iv). The Employees

---

[24]PBGC's brief on appeal states that its deficit at the time of this appeal was over $18 billion dollars.

have not pointed to a section of ERISA that either compels PBGC to pursue claims against plan fiduciaries or provides guidelines for PBGC to follow in exercising its power to sue.

The Employees argue that the application of the presumption does not extend to claims against the PBGC for breach of fiduciary duty under 29 U.S.C. § 1132(a)(2), found in Title I of the ERISA statute. However, PBGC's role as a fiduciary to plan participants is expressly limited by 29 U.S.C. § 1342(d)(3), which indicates that a trustee is not a fiduciary to the extent that the requirements of Title IV, in which the trustee's discretionary power to sue is found, are inconsistent with the requirements of Title I. Further, the fiduciary duty standard stated in 29 U.S.C. § 1104(a) is expressly subject to the provisions of 29 U.S.C. §§ 1342, which defines the trustee's powers. Therefore, although PBGC might be sued for an alleged breach of a fiduciary duty owed to a plan participant, the relevant duties are limited by Title IV of ERISA, and it does not follow that PBGC may be sued for its decision not to pursue an action against a third party.

**[27]** PBGC's discretionary decision not to pursue claims against the Fiduciary Defendants and Towers Perrin comes within the *Heckler* presumption against judicial review, and nothing in ERISA rebuts the presumption. Accordingly, we hold that the PBGC's decision is immune from judicial review and affirm the dismissal of the Employees' sixteenth claim for relief.

## IV.

The Employees lack Article III standing to bring their ERISA claims seeking relief under 29 U.S.C. § 1132(a)(2) against the Fiduciary Defendants because it is not likely that their injury would be redressed if they were to prevail on these claims. Further, the Employees' claims seeking relief pursuant to 29 U.S.C. § 1132(a)(3) do not seek appropriate equitable relief. Therefore, the district court properly dis-

missed claims one through five. Although California law does not generally impose a duty of ordinary care on Towers Perrin to the Employees, who are not its clients, Towers Perrin is obligated to act with ordinary care toward the intended third party beneficiaries of its contracts. Because we cannot assess whether the Employees are intended third party beneficiaries of Towers Perrin's engagement agreement based on the present record, we reinstate claims six and seven and remand to the district court for further proceedings. Regarding the sixteenth claim for relief, PBGC's discretionary decision not to pursue claims against the Fiduciary Defendants or Towers Perrin is not subject to review because of the complicated balancing of policies and interests PBGC must engage in to determine whether such enforcement action is proper, a task which is within PBGC's peculiar expertise. Accordingly, the decision of the district court is **AFFIRMED in part**, **REVERSED in part**, and **REMANDED**.

Each party shall bear its own costs on appeal.